# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICHAEL HIGGIN and MICHAEL MENNELLA, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | C.A. No. 2022-0641-NAC |
| THE HONORABLE ANTHONY J. ALBENCE, in his official capacity as State Election Commissioner, and STATE OF DELAWARE DEPARTMENT OF ELECTIONS, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| AYONNE "NICK" MILES, PAUL J. FALKOWSKI, and NANCY M. SMITH, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 2022-0644-NAC |
| v. | ) ) | |
| DELAWARE DEPARTMENT OF ELECTIONS, and ANTHONY J. ALBENCE, State Election Commissioner, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  August 31, 2022
Date Decided:  September 14, 2022

M. Jane Brady, BRADY LEGAL GROUP LLC, Lewes, Delaware; Charlotte Davis, Noel H. Johnson, PUBLIC INTEREST LEGAL FOUNDATION, Indianapolis, Indiana; *Counsel for Plaintiffs Michael Higgin and Michael Mennella*.

Julianne E. Murray, LAW OFFICES OF MURRAY, PHILLIPS & GAY, Georgetown, Delaware, *Counsel for Plaintiffs Ayonne "Nick" Miles, Paul J. Falkowski, and Nancy M. Smith*.

Allison J. McCowan, Zi-Xiang Shen, Victoria R. Sweeney, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE, *Counsel for Defendants Delaware Department of Elections and Anthony J. Albence, State Election Commissioner*.

**COOK, Vice Chancellor.**

Delaware's general election is set to occur on November 8, 2022. Earlier this year, our General Assembly enacted laws allowing Delawareans to register to vote the same day as the general election (the "Same-Day Registration Statute") and to cast their ballot by mail in the general election for any reason (the "Vote-by-Mail Statute").[1] Within hours of the laws being put into effect, the plaintiffs in this litigation filed two separate lawsuits challenging the new laws' constitutionality. The parties agreed to a highly expedited schedule and brought cross-motions for summary judgment to resolve the plaintiffs' litigation well before ballots would be mailed to voters for the upcoming general election.

The plaintiffs represent various components of the election process—voters, a political candidate, and an election official. They argue that the Same-Day Registration Statute and the Vote-by-Mail Statute are irreconcilable with the Delaware Constitution. Accordingly, they ask the Court to (1) enjoin the defendants—the State's Department of Elections and its commissioner, Anthony J. Albence—from implementing the statutes for the general election; and (2) declare that the statutes at issue are unconstitutional with respect to the general election.

---

[1] To be clear, the plaintiffs' challenge only concerns the general election and has no bearing on the primary election held on September 13, 2022.

For their part, the defendants argue that the plaintiffs lack standing to challenge the laws. They also argue the plaintiffs have not met their burden for permanent injunctive relief. In particular, the defendants argue that the plaintiffs cannot demonstrate actual success on the merits because the laws are valid, failed to demonstrate irreparable harm, and also failed to prove that the balance of the equities weighs in their favor.

As for standing, although the plaintiffs likely would not have standing under federal jurisprudence, I conclude that the plaintiffs have standing to challenge the Vote-by-Mail Statute under state law. Delaware state courts are not bound by the federal standing doctrine and adopt standing rules to avoid issuing advisory opinions to "mere intermeddlers." In this case, the plaintiffs represent various parts of the election process, and I conclude they have a substantial interest in this court reaching a decision on the merits, particularly given the fundamental nature of voting. I also assume, for the purposes of this opinion, that the plaintiffs have standing to challenge the Same-Day Registration Statute.

Turning to the merits, unlike the federal legislative power, our State's General Assembly enjoys broad legislative power curtailed only by the limits of the state and federal constitutions. There is also a strong presumption of constitutionality, and to overcome that presumption, there must be "clear evidence" of its incompatibility with our State's governing document. The plaintiffs' challenge to the Same-Day

Registration Statute does not overcome that presumption. Article V, Section 4 provides that there must be "at least" two registration days within the time-period described there. By its own terms, it establishes a constitutional floor, not a ceiling. In addition, the General Assembly adopted an amendment to Article V, Section 4 in 1925 that specifically deleted language requiring that registration "be completed" by a certain number of days before a general election. The plaintiffs' arguments fail to grapple with this significant change to the constitutional text. Thus, the plaintiffs have failed to meet their burden of showing by "clear evidence" a constitutional violation, and the Same-Day Registration Statute stands.

The Vote-by-Mail Statute presents a much thornier issue. This is not the first time this Court has reviewed mail-in voting laws. In 2020, the General Assembly enacted a very similar vote-by-mail law under its emergency powers, which was upheld by this Court. Today, however, emergency powers are not invoked. The General Assembly, and the defendants, instead rely on Article V, Section 1, which provides that the General Assembly "may by law prescribe the means, methods and instruments of voting so as best to secure secrecy and the independence of the voter, preserve the freedom and purity of elections and prevent fraud, corruption and intimidation thereat."

The plaintiffs argue that Article V, Section 4A of the Delaware Constitution, however, provides for absentee voting in certain enumerated circumstances. Our

Supreme Court and this Court have consistently stated that those circumstances are exhaustive. Therefore, as a trial judge, I am compelled by precedent to conclude that the Vote-by-Mail Statute's attempt to expand absentee voting to Delawareans who do not align with any of Section 4A's categories must be rejected. As I describe in this opinion, were I to construe the relevant constitutional sections and statutes on a blank slate, I would likely conclude that the plain text of the constitution, coupled with the strong presumptions in favor of constitutionality of legislative acts, lead me to a different result. But, in light of applicable and controlling precedent, I must find that the Vote-by-Mail Statute is unconstitutional for purposes of the general election.

Finally, I conclude that, in light of my ruling on the merits, there would be irreparable harm in the absence of injunctive relief and that the balance of the equities favors entry of an injunction.

For these reasons, the plaintiffs' motion for summary judgment is denied in part and granted in part, and the defendants' motion for summary judgment is also denied in part and granted in part.

# I. BACKGROUND[2]

## A. The Parties

This matter involves two related actions commenced on July 22, 2022. Plaintiffs in both actions are Delaware residents.

Plaintiffs Michael Higgin and Michael Mennella filed the first of the two actions. Mr. Higgin is a resident of Bear, Delaware; a registered voter; and a General Election candidate for State Representative in District 15.[3] Mr. Mennella is a resident of Newark, Delaware; is a registered voter; and plans to vote in the upcoming General Election.[4] Mr. Mennella has also served as an inspector of elections "in at least 8 elections during the last 5 to 6 years" and plans to serve as an inspector of elections during the upcoming General Election.[5] Mr. Mennella states,

---

[2] I base the facts of this summary judgment ruling on the evidence submitted under affidavit with the briefing as well as the pleadings involving undisputed facts. No material facts are in dispute for purposes of resolving the parties' cross-motions for summary judgment. *See* Pls.' Combined Reply Br. in Support of Pls.' Mot. for Summ. J. and Answering Br. in Resp. to Defs.' Cross-Mot. for Summ. J. at 4 (C.A. No. 2022-0641-NAC, Dkt. 29) ("Pls.' Combined Reply Br.") (stating that Plaintiffs do not dispute Defendants' recitation of facts other than one immaterial assertion by Defendants regarding 15 *Del. C.* § 4937).

[3] Affidavit of Michael Higgin, ¶¶ 3–4 (C.A. No. 2022-0641-NAC, Dkt. 24) ("Higgin Aff.").

[4] Affidavit of Michael Mennella, ¶¶ 3, 5 (C.A. No., 2022-0641-NAC, Dkt. 23) ("Mennella Aff.").

[5] Mennella Aff., ¶¶ 4, 6. Mr. Mennella's counsel acknowledged that, as of oral argument on Plaintiffs' cross-motion for summary judgment, Mr. Mennella had not yet been selected to serve as an inspector of elections.

"[i]n his role as inspector of elections, [he] is responsible for overseeing the election at his assigned polling place and administering the election in accordance with the Delaware Constitution, statutes, and other laws."[6]

Plaintiffs Ayonne Miles, Paul Falkowski, and Nancy Smith filed the second related action. Mr. Miles is a resident of Kent County, Delaware, and a registered voter.[7] Mr. Falkowski is a resident of New Castle County, Delaware, and a registered voter.[8] Ms. Smith is a resident of Sussex County, Delaware, and a registered voter.[9]

I refer to the first action as the "Higgin Action" and to the second action as the "Miles Action." I refer to the plaintiffs in the Higgin Action as the "Higgin Plaintiffs" and to the plaintiffs in the Miles Action as the "Miles Plaintiffs." References to "Plaintiffs" includes the Higgin Plaintiffs and the Miles Plaintiffs, collectively.

---

[6] Verified Complaint for Declaratory Judgment and Injunctive Relief, ¶ 14 (C.A. No. 2022-0641-NAC, Dkt. 1) ("Higgin Compl."); *see also* 15 *Del. C.* §4946 (providing the powers of election officers, including inspectors of election, to preserve order during elections).

[7] Verified Complaint Seeking Injunctive Relief and Declaratory Judgment, ¶ 1 (C.A. No. 2022-0644-NAC, Dkt. 1) ("Miles Compl.").

[8] Miles Compl., ¶ 2.

[9] *Id.*, ¶ 3.

The defendants in both the Higgin Action and the Miles Action are the same: Anthony J. Albence, in his official capacity as Delaware's State Election Commissioner, and the State of Delaware Department of Elections ("DOE") (collectively, "Defendants").[10] Commissioner Albence has statutory responsibilities to provide general supervision to the DOE and to develop regulations, policies, procedures, and guidelines in accordance with Title 15 of the Delaware Code.[11] The DOE is the Delaware agency responsible for "administer[ing] the election laws of this State," including registering and educating voters, conducting fair and impartial elections, managing campaign finance, and collecting and reporting election results.[12]

## B. The Delaware Constitution

Article V of the Delaware Constitution governs elections. This litigation implicates multiple provisions of Article V of the Delaware Constitution.[13] It is

---

[10] *See* Higgin Compl.; Miles Compl.

[11] *See* 15 *Del. C.* § 302; Affidavit of Anthony J. Albence, ¶ 2 (C.A. No. 2022-0641-NAC, Dkt. 28) ("Albence Aff.").

[12] 15 *Del. C.* § 101(6); *see also About Agency*, STATE OF DELAWARE DEPARTMENT OF ELECTIONS, https://elections.delaware.gov/aboutagency.shtml (last visited September 14, 2022).

[13] *See* Appx. A for the full text of the applicable provisions of Article V of the Delaware Constitution.

under the authority of Section 1 of Article V that the General Assembly purported to implement its "no-excuse" vote-by-mail system.[14]   The parties' arguments concerning the Same-Day Registration Statute implicate Article V, Section 4, which sets forth the laws governing the "[r]egistration of votes" and "days for registration." The parties' arguments concerning the Vote-by-Mail Statute implicate Article V, Section 4A, which sets forth "[g]eneral laws for absentee voting."

**C. Legislative Background**

This litigation concerns the constitutionality of two recently passed Delaware laws.  The first law allows Delaware voters to vote by mail in the General Election without providing a reason for doing so (referred to as the Vote-by-Mail Statute).[15] Of note, and as discussed in greater detail below, the Vote-by-Mail Statute was preceded by a similar vote-by-mail law passed during the COVID-19 pandemic.  The second law at issue allows individuals to register to vote up through and including on the same day that they cast their ballot in the General Election (referred to as the Same-Day Registration Statute).[16]  Both statutes were signed into law on July 22,

---

[14] 83 Del. Laws ch. 353 (2022).

[15] 83 Del. Laws ch. 353 (2022); Transmittal Affidavit of Zi-Xiang Shen, Ex. A (C.A. 2022-0641-NAC, Dkt. 28) ("Shen Aff.").

[16] 83 Del. Laws ch. 354 (2022); Shen Aff., Ex. B.

2022, and became effective immediately, including for the September 13, 2022 Primary Election and for the upcoming November 8, 2022 General Election.[17]

### 1. The Prior Vote-by-Mail Statute

In 2020, the General Assembly enacted a statute that permitted all Delaware voters to vote by mail (the "Prior Vote-by-Mail Statute").[18] The General Assembly passed the measure pursuant to its emergency powers due to the ongoing COVID-19 pandemic.[19] The Prior Vote-by-Mail Statute expired by its own terms on January 12, 2021.[20]

The statute included multiple findings and declarations by the General Assembly. The eleventh finding and declaration of the General Assembly made therein states that the list of six reasons for absentee voting provided under Article V, Section 4A of the Delaware Constitution is "exhaustive."[21] In addition, the twelfth and thirteenth findings and declarations provide that the authority of the General Assembly to pass the Prior Vote-by-Mail Statute is found under the General

---

[17] Albence Aff., ¶ 12; Shen Aff., Exs. C–D. Plaintiffs commenced this litigation within hours after the Governor signed the two bills into law.

[18] 82 Del. Laws ch. 245, § 3 (2020) (codified at 15 *Del. C.* § 5620), *repealed by* 82 Del. Laws ch. 245, § 4 (2020).

[19] 82 Del. Laws ch. 245, § 1 (2020).

[20] 82 Del. Laws ch. 245, § 4 (2020).

[21] 82 Del. Laws ch. 245, § 1 (2020).

Assembly's emergency powers.[22]  This point was then reiterated in the synopsis, which provides, in part, that the General Assembly's "authority to implement voting by mail stems from . . . Article XVII of the Delaware Constitution[,]" which provides the General Assembly with the power "to adopt measures that may be necessary and proper for insuring the continuity of governmental operations *including nonconformity with the requirements of the Constitution* when in the judgment of the General Assembly to do so would be impracticable."[23]

The statute was then the subject of litigation in this Court, against the same defendants, in an action styled *Republican State Committee of Delaware v. Department of Elections*.  The plaintiffs in that litigation challenged the Prior Vote-by-Mail Statute as violating the Delaware Constitution.[24]  Following expedited litigation, this Court granted summary judgment in favor of the defendants.[25]

---

[22] *Id*.

[23] Del. H.B. 346 syn., 150th Gen. Assem. (2020) (emphasis added).

[24] *Republican State Comm. of Del. v. Dep't. of Elections*, 250 A.3d 911, 914 (Del. Ch. 2020).

[25] *Id*. at 922.  In the course of his ruling, Vice Chancellor Glasscock noted that "the DOE concedes that the Delaware Constitution lists reasons for which ballots may be provided for absentee voting, that this list of reasons is intended to be comprehensive, and that the current epidemic health crisis is not among them."  *Id*. at 913.  During oral argument in this matter, Defendants' counsel indicated that she did not agree with the point. Transcript of Oral Argument on Cross-Motions for Summary Judgment Held via Zoom at 100:14–103:13 (C.A. No. 2022-0641-NAC, Dkt. 36) ("Summ. J. Arg. Tr.").  In any event, Plaintiffs have not made any serious effort to argue for estoppel in this litigation.

## 2.     Attempted Constitutional Amendment

In 2020, the General Assembly also approved the "first leg" of an amendment to the Delaware Constitution that would replace Article V, § 4A in its entirety with the following language: "The General Assembly shall enact general laws providing the circumstances, rules, and procedures by which registered voters may vote by absentee ballot."[26]

In June 2022, the General Assembly attempted to pass the "second leg" of the amendment to Article V, § 4A.[27] This time, however, the vote was unsuccessful, as it failed to obtain the necessary two-thirds approval of both houses of the 151st General Assembly.[28] According to Plaintiffs, the Chairwoman of the House Administration Committee, who supported the amendment to Article V § 4A, "after realizing that there were not enough votes at the time to get the bill passed through a second session, . . . changed her vote to 'No' so the bill could later be brought to the floor if the sponsors were able to secure sufficient votes to pass the

---

[26] Del. H.B. 73, 150th Gen. Assem. (2020).

[27] *See* Del. H.B. 75 syn., 151st Gen. Assem. (2021) ("This Act is the final leg of a constitutional amendment that would eliminate from the Delaware Constitution the limitations as to when an individual may vote by absentee ballot.").

[28] *See House Bill 75*, DELAWARE GENERAL ASSEMBLY, https://legis.delaware.gov/BillDetail?LegislationId=48291 (last visited September 12, 2022).

amendment."[29]  The parties agree that, once the amendment to the Delaware Constitution failed to obtain the necessary two-thirds approvals, the General Assembly passed the Vote-by-Mail Statute that is the subject of this litigation less than three weeks later by simple majority approval.[30]

This alternative approach created significant controversy.  The remarks by legislators indicate an awareness by at least some members of the General Assembly that the laws might not be constitutional and that a challenge in the courts would be forthcoming.  For example, a member of the Senate, who was the primary sponsor of the Vote-by-Mail Statute, stated that, "[s]hould the Supreme Court determine at some point related to this bill . . . that we have exceeded our powers, the Supreme Court will tell us so" and that "having clarity on that issue is positive for this body [and] for the voters of Delaware . . . ."[31]  Perhaps most notably, the Speaker of the House stated, "I don't know whether it's constitutional or not constitutional, and

---

[29] Plaintiffs' Amended Motion for Emergency Temporary Restraining Order, ¶ 8 (C.A. No. 2022-0641-NAC, Dkt. 4) ("Pls' Am. Mot. Emergency TRO").

[30] *Compare House Bill 75*, Delaware General Assembly, https://legis.delaware.gov/BillDetail?LegislationId=48291 (last visited September 12, 2022), *with Senate Bill 320*, Delaware General Assembly, https://legis.delaware.gov/BillDetail?legislationId=129685 (last visited September 12, 2022) (showing that House Bill 75 was defeated in the House on June 10, 2022, and Senate Bill 320 was passed by the House on June 29, 2022).

[31] 151st Gen. Assem. Senate – 35th Legislative Day – Session 2 at 11:54:57 P.M (Senator Gay).

neither do you guys or anybody else in here. The best way to get this thing done is to hear this bill, move forward, and let a challenge go to the courts and let them decide it."[32]

### 3. Current Vote-by-Mail Statute

The Vote-by-Mail Statute allows qualified, registered voters to apply and request a mail-in ballot from the DOE, which confirms that the elector qualifies to vote.[33] The requested ballot is mailed to the voter, who must confirm and provide required identification information, seal the ballot envelope, sign the voter oath on the envelope, place a provided security label over the identification information, and either mail the ballot to the DOE or place it in a secure drop-box at a county election office.[34] Once the DOE receives the mailed-in ballot, the DOE may process and scan the ballot, but it may not tabulate the ballot until the day of the election.[35]

---

[32] 151st Gen. Assem. House – 33rd Legislative Day – Session 2 at 6:48:30 P.M. (Speaker Schwartzkopf); *see also* Plaintiffs' Opening Brief in Support of Motion for Summary Judgment at 17–18 (C.A. No. 2022-0644-NAC, Dkt. 14) (stating that Senator Richardson argued the law was unconstitutional and observing that "[i]n both houses there was testimony from attorneys that SB 320 was unconstitutional").

[33] 83 Del. Laws ch. 353, § 5604(A) (2022).

[34] 83 Del. Laws ch. 353, § 5608(A) (2022).

[35] *Id.*; *see also* 83 Del. Laws ch. 353, § 5611A(6) ("The results of the mail ballots shall not be extracted or reported before the polls have closed on the day of the election.").

Commissioner Albence's affidavit provides that election officers are not involved in opening, processing, or tabulating any mail-in ballots.[36]

Quite notably, at oral argument, counsel for the Defendants acknowledged that the current Vote-by-Mail Statute is not materially different from the Prior Vote-by-Mail Statute, except that under the Prior Vote-by-Mail Statute all voters automatically received an application to vote by mail whereas voters must request such an application under the current Vote-by-Mail Statute.[37]

### 4.     The Same-Day Registration Statute

The Same-Day Registration Statute extends the deadlines to register to vote in a primary, general, or special election to include the day of the election.[38] Sections 2036 and 2047 of Title 15 previously provided that voters had to be registered by the "fourth Saturday prior to the date of" a primary or general election, or by 10 days prior to a special election, in order to vote in that election.[39] Title 15 does not

---

[36] Albence Aff., ¶ 17.

[37] Summ. J. Arg. Tr. at 99:3–100:3.

[38] 15 *Del. C.* § 2036; *see also* Del. H.B. 25 syn., 151st Gen. Assem. (2022) ("This bill provides for election day registration for presidential primary, primary, special, and general elections whereas currently the deadline is the fourth Saturday prior to the date of the election.").

[39] 15 *Del. C.* § 2036 (2015); 79 Del. Laws ch. 275, § 2036; Albence Aff. ¶ 18.

establish a deadline prior to which a voter cannot register.[40]  Under the Same-Day

Registration Statute, same-day registrations at polling locations will be handled at a

"help desk," and registration issues will be handled by DOE staff from the county

offices.[41]  Commissioner Albence's affidavit provides that election officers are not

involved in addressing registration or eligibility concerns.[42]  The DOE will maintain

an electronic poll list with updates made as close to real-time as possible; that list

may be requested by an election candidate.[43]

### D. Delaware's 2022 Primary Election and General Election

The 2022 Delaware Primary Election took place on September 13, 2022.  The

2022 Delaware General Election will take place on November 8, 2022.  None of the

Plaintiffs in this litigation are challenging either statute with respect to the Primary

Election.  Their claims concern only the General Election.  The DOE can begin

---

[40] 15 *Del. C.* § 2036; Albence Aff., ¶ 18.

[41] Albence Aff., ¶¶ 20–21.  Plaintiffs dispute this fact and assert that 15 *Del. C.* § 4937 specifies that "[i]n the event of a challenge as to the identity of the voter or residency of the voter, the voter's right to vote shall be determined by a majority vote of the inspector and the 2 judges of the election." Pls.' Combined Reply Br. at 4.  I note that this dispute is immaterial to the resolution of this case, and so is not addressed.

[42] Albence Aff., ¶ 21.

[43] Albence Aff., ¶¶ 22–23.

distributing ballots to electors who requested to cast their vote by mail for the General Election no earlier than October 10, 2022.[44]

### E. Procedural History

On July 22, 2022, within hours after Delaware's Governor signed the challenged statutory enactments into law, the Higgin Plaintiffs filed their verified complaint for declaratory and injunctive relief, along with a motion to expedite and a motion for a temporary restraining order. On that same day, in a separate action, the Miles Plaintiffs filed their verified complaint for declaratory and injunctive relief and a motion to expedite and for entry of a status quo order.

Both sets of plaintiffs have asserted claims that the Vote-by-Mail Statute violates the Delaware Constitution and will dilute their votes by allowing individuals to vote in a manner contrary to the Delaware Constitution. Only the Higgin Plaintiffs challenge the Same-Day Registration Statute as violating the Delaware Constitution.

The parties agreed to treat this litigation as expedited to facilitate resolution before the DOE would need to disseminate mail-in ballots for the General Election.[45]

---

[44] Albence Aff., ¶ 16.

[45] *See* Defendants' Letter to the Court in Response to the Court's Letter Dated July 27, 2022, at 1-2 (C.A. No. 2022-0641-NAC, Dkt. 5) ("With respect to Plaintiffs' motions for expedited proceedings, Defendants do not oppose expedition of the cases. The parties have reached an agreement to submit cross-motions for summary judgment on an expedited briefing schedule to attain timely final resolution of the issues.").

Following a teleconference with the parties on Friday, July 29, 2022, the Miles Plaintiffs filed a letter with the Court on August 1, 2022, withdrawing their motion for a status quo order based on Defendants' counsel's representation that no ballots could be mailed to potential voters before October 10, 2022.[46] That same day, August 1, counsel in the Higgin Action filed an Amended Motion for Emergency Temporary Restraining Order.[47]

I denied the TRO by bench ruling on August 5, 2022.[48] In doing so, I concluded that, while the Higgin Plaintiffs had demonstrated a colorable claim, they had not adequately shown imminent, irreparable harm, particularly given that this Court would rule on their claims well before the October 10 ballot mailing date.[49] I noted that the balance of the equities also favored denying the TRO.[50] This was because of the practical difficulties with implementing injunctive relief while the DOE was attempting to quickly implement the new Vote-by-Mail Statute for the

---

[46] Letter to Vice Chancellor Cook Withdrawing Request for Status Quo Order and Including Plaintiffs' Proposed Scheduling Order (C.A. 2022-0644-NAC, Dkt. 9).

[47] Pls' Am. Mot. Emergency TRO.

[48] Order (C.A. 2022-0641-NAC, Dkt. 18).

[49] Transcript of Oral Argument and Rulings of the Court on Plaintiffs' Motion for a Temporary Restraining Order at 33–51 (C.A. No. 2022-0641-NAC, Dkt. 31).

[50] *Id*. at 50–51.

17

fast-approaching Primary Election—an aspect of the law that none of the Plaintiffs challenged.[51]

## II. ANALYSIS

### A. The Relevant Legal Standards

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[52] "Where, as here, the only issues in contention are interpretations of statutory or constitutional language—both of which are questions of law—summary judgment is appropriate."[53]

As noted, Plaintiffs ask this Court for not just declaratory relief but a permanent injunction enjoining Defendants from "enforcing Delaware statutes allowing mail-in voting" and "same-day registration."[54]  "The elements for permanent injunctive relief are: (1) actual success on the merits; (2) irreparable harm

---

[51] *Id.*

[52] *See* Ct. Ch. R. 56(c); *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *7 (Del. Ch. Mar. 16, 2011).

[53] *Republican State Comm.*, 250 A.3d at 916; *see also First Health Settlement Class v. Chartis Specialty Ins. Co.*, 111 A.3d 993, 998 (Del. 2015) ("Interpretation of a statute is a question of law . . . .").

[54] Higgin Compl. at 19; *see also* Miles Compl. at 10 (requesting in their prayer that, among other relief, the court issue "a permanent injunction enjoining Defendants from implementing [the Vote-by-Mail Statute]" and "enjoining Defendants from publishing processes and procedures for implementation" of that law for the General Election).

will be suffered if injunctive relief is not granted; and (3) the harm that will result from a failure to enjoin the actions that threaten plaintiff outweighs the harm that will befall the defendant if an injunction is granted."[55] Our Supreme Court has called a permanent injunction "an extraordinary form of relief."[56]

## B. Standing

Before addressing Plaintiffs' claims, I must determine whether they have standing to bring them. "The term 'standing' refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance."[57] "It is concerned only with the question of *who* is entitled to mount a legal challenge . . .

---

[55] *Sierra Club v. Del. Dep't of Nat. Res. & Env't Control*, 2006 WL 1716913, at *3 (Del. Ch. June 19, 2006); *see also Jestice v. Buchanan*, 2000 WL 875417, at *1 (Del. Ch. May 23, 2000) ("In order to demonstrate entitlement to a permanent injunction, the plaintiff must demonstrate not only that she is correct in her legal claim, but that absent the injunction she will be irreparably harmed and that this harm outweighs harm reasonably likely to occur to the defendants should the injunction be entered.").

[56] *N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 384 (Del. 2014).

[57] *Dover Hist. Soc'y v. Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

."[58] Because standing is a "jurisdictional requirement[,]"[59] it is "properly a threshold question that the Court may not avoid."[60]

To establish standing, a plaintiff must show, among other things, an injury to a legally protected interest.[61] The injury element divides into three components: injury in fact, causation, and redressability.[62] Defendants only dispute Plaintiffs' alleged injuries in fact. So I will start and end there.

To qualify as an injury in fact, the asserted harm must be "concrete and particularized, and . . . actual or imminent, not conjectural or hypothetical."[63] For an injury to be particularized, "it must affect the plaintiff in a personal and individual

---

[58] *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991) (emphasis in original).

[59] *Hall v. Coupe*, 2016 WL 3094406, at *3 (Del. Ch. May 25, 2016) (citing *Dover Hist. Soc'y*, 838 A.2d at 1110).

[60] *Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 129 (Del. 2021) (internal quotation marks omitted); *see Dover Hist. Soc'y*, 838 A.2d at 1110 ("Standing is a threshold question that must be answered . . . affirmatively to ensure that the litigation . . . is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers."); *see also Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) ("If there is no standing, there is no justiciable substantive controversy.").

[61] *E.g.*, *Gannett Co., Inc. v. State*, 565 A.2d 895, 897 (Del. 1989).

[62] *E.g.*, *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 904 (Del. 1994).

[63] *Id.* (internal quotation marks omitted).

way."[64]  For an injury to be concrete, it "must be '*de facto*'; that is, it must actually exist."[65]  A "risk of real harm" may qualify as concrete.[66]

Standing "cannot be inferred argumentatively" but rather must "affirmatively appear in the record."[67]  "When a motion for summary judgment is filed" on the question of standing, "the plaintiff can no longer rest on 'mere allegations.'"[68]  Instead, the plaintiff "must set forth by affidavit or other evidence specific facts" supporting its standing.[69]

---

[64] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted).

[65] *Id.* at 340.

[66] *Id.* at 341–42; *see, e.g.*, *Save the Courthouse Comm. v. Lynn*, 408 F. Supp. 1323, 1332 (S.D.N.Y. 1975) (Even if "a benefit hardly can be quantified," a "loss of it [still may] support a finding of standing."); *accord Dover Hist. Soc'y*, 838 A.2d at 1112; *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (To establish injury in fact, the plaintiff must "show that he personally suffered some actual or *threatened injury* as a result of the putatively illegal conduct of the defendant." (emphasis added) (internal quotation marks omitted)).

[67] *Spencer v. Kemna*, 523 U.S. 1, 10–11 (1998) (internal quotation marks omitted).

[68] *Dover Hist. Soc'y*, 838 A.2d at 1110; *see also Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007) ("The burden is on the Plaintiffs to prove jurisdiction exists." (internal quotation marks omitted)).

[69] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks and citation omitted); *accord Dover Hist. Soc'y*, 838 A.2d at 1110.

### 1. Standing to Challenge the Same-Day Registration Statute

Only the Higgin Plaintiffs challenge the Same-Day Registration Statute. Each of them asserts a separate harm.

Higgin alleges that the Same-Day Registration Statute harms his political candidacy. He claims that the Same-Day Registration Statute (i) has weakened or frustrated his campaign; and (ii) ultimately will make the General Election unreliable.[70]

For his part, Mennella alleges harm based on his anticipated role as a volunteer election inspector. According to Mennella, an election inspector "oath" will require him to admit to the polls any person who is authorized to vote under the Same-Day Registration Statute.[71] But because that Statute is unconstitutional, he insists, he effectively will be required to approve illegal voting.[72] Worse, if he refuses to admit same-day-registered voters, he claims he would face fines and even incarceration.[73]

In Defendants' view, none of these grounds is sufficient to confer standing because each one rests on a speculative injury. There is some appeal to this argument

---

[70] *See* Higgin Aff. ¶¶ 7, 9–10.

[71] *See* Mennella Aff. ¶¶ 7–9.

[72] *See id.* ¶¶ 11–12.

[73] *See id.* ¶¶ 10, 13.

22

as applied to Higgin. Faced with a motion for summary judgment, Higgin must marshal "specific facts" supporting his standing.[74] He has not. Higgin offers very little, if any, evidence that his campaign efforts have been disrupted.[75] Nor has he explained how the Same-Day Registration Statute has personally or concretely impeded (or will impede) his continuing campaign efforts.[76]

In addition, as discussed later in this decision, Higgin argues that the Delaware Constitution requires all registration for the General Election to occur no less than 10 days prior to the General Election. Assuming that is true, the maximum harm caused by the Same-Day Registration Statute would be contained to the limited number of voters who register to vote over those final 10 days. Compared with the number of votes that may ultimately be cast via the Vote-by-Mail Statute,[77] the

---

[74] *Dover Hist. Soc'y*, 838 A.2d at 1110 (internal quotation marks omitted).

[75] *See* Higgin Aff. ¶ 6 (affirming simply that Higgin is "actively campaigning").

[76] *See id.* ¶ 7 (raising concerns about proper allocation of campaign resources, but omitting specific facts supporting a finding that the Same-Day Registration Statute has negatively impacted resources already devoted or strategies or methods designed to devote resources in the future).

[77] A brief review of Delaware election data suggests that, when made available to everyone, mail-in voting significantly increases the number of absentee votes cast for each candidate. *Compare 2020 General Election Report*, Del. Dep't of Elections, https://elections.delaware.gov/results/html/index.shtml?electionId=GE2020 (last updated Nov. 11, 2020, 2:45 PM), *with 2016 General Election Report*, Del. Dep't of Elections, https://elections.delaware.gov/archive/elect16/elect16_general/html/election.shtml (last updated Nov. 17, 2016, 4:35 PM).

23

alleged harm inflicted by the Same-Day Registration Statute is small and Defendants' arguments concerning the speculative nature of the minimal evidence put forward by Higgin have more force.

With respect to Mennella, Defendants' arguments are more fluid. Mennella and Defendants contest whether Mennella would, as an election inspector, be required to have any involvement whatsoever in connection with voter registration under the Same-Day Registration Statute.[78] Defendants, however, also have maintained that the challenged statutes were only recently enacted and that their implementation is on-going.[79]

Defendants also wade into the thickets of Mennella's specific responsibilities as an election inspector *vis-à-vis* the Same-Day Registration Statute.[80] For standing

---

[78] Although Mennella has not yet been selected as an election inspector, *see* Mennella Aff. ¶ 6, he anticipates, based on his prior years of service, that he will be selected, *see* Summ. J. Arg. Tr. at 19:11–18. Defendants have noted that Mennella has not yet been selected, but have not contested the likelihood that he will be selected. *See, e.g.*, Summ. J. Arg. Tr. at 72:8–15. Accordingly, I treat this fact as undisputed.

[79] *See, e.g.*, Albence Aff. ¶ 26 (listing DOE's "ongoing efforts" to implement the new laws). Indeed, the fluidity surrounding the DOE's implementation of the challenged statutes was a theme of Defendants' opposition to the Higgin Plaintiffs' motion for a temporary restraining order. *See* Defs.' Opp'n to Pls.' Am. Mot. for Emergency TRO ¶ 19 (C.A. No. 2022-0641-NAC, Dkt. 12) (characterizing as "speculative" the idea that Mennella "would be required to conduct his duties under conflicting direction" without explaining why that is so).

[80] *See generally* 15 *Del. C.* §§ 4904, 4937(c), 4938, 5112, 5126.

24

purposes in this particular expedited context, I do not believe that I am required to dwell on all the possible hypothetical fact scenarios that could arise, particularly when the challenged law is new, the implementation of the law is on-going, and questions surrounding how it will ultimately be implemented will likely remain outstanding (or continue to arise) until the General Election.[81]

In any event, because of my decision below concerning success on the merits, I need not actually decide if the Higgin Plaintiffs have standing to challenge the Same-Day Registration Statute. In *Republican State Committee*, Vice Chancellor Glasscock assumed, without deciding, the existence of standing because the claimant's underlying challenge failed on the merits anyway.[82] That approach is appropriate here because, even if they had standing, the Higgin Plaintiffs still would not prove actual success on the merits of their challenge to the Same-Day Registration Statute. Accordingly, and given the expedited nature of this litigation, I will assume they have standing so I may resolve that aspect of this case.

---

[81] *See In re Del. Pub. Schs. Litig.*, 239 A.3d 451, 510 (Del. Ch. 2020) ("State courts . . . are free to reject procedural frustrations [involving standing] in favor of just and expeditious determination on the ultimate merits." (internal quotation marks omitted)).

[82] *See Republican State Comm.*, 250 A.3d at 918.

## 2. Standing to Challenge the Vote-by-Mail Statute

All Plaintiffs challenge the Vote-by-Mail Statute. Separately, the Higgin Plaintiffs reassert the same bases for standing that I discussed previously. Together, each of the Plaintiffs argues that the Vote-by-Mail Statute will undermine the election by allowing unauthorized votes to be cast. This injury is particularized and concrete, they say, because it is likely to "dilute" or cancel out their votes.[83]

Plaintiffs' use of the word "dilution" has led Defendants to advance a phalanx of cases holding that voter dilution is a paradigmatic generalized grievance insufficient to differentiate an individual voter from any other citizen.[84]

It is generally true that, "[i]n order to achieve standing, the plaintiff's interest in the controversy must be distinguishable from the interest shared by other members of a class or the public in general."[85] And this is particularly true under federal law, on which Defendants almost exclusively rely. But Defendants' narrow focus on federal standing doctrine overlooks Delaware standing doctrine. Delaware standing doctrine is less rigid. In Delaware, standing is "predominantly discretionary and

---

[83] Pls.' Combined Reply Br. at 11–12.

[84] *See* Defs.' Opening Br. in Supp. of Mot. for Summ. J. at 18–19 (C.A. No. 2022-0641-NAC, Dkt. 28) ("Defs.' Opening Br.").

[85] *Stuart Kingston*, 596 A.2d at 1382.

26

prudential"[86] and applied "as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are 'mere intermeddlers.'"[87]

As discussed below, I do not find Plaintiffs to be "mere intermeddlers." They are voters, a political candidate, and an election official. They represent various groups directly affected by these laws. The constitutionality of laws that change basic aspects of voting—one of the most fundamental rights Delawareans possess—are of great public importance. All this is enough to establish standing.

### a. Plaintiffs' Standing under Delaware Law

The standards for evaluating standing to sue in federal court are "generally the same as the standards for determining standing to bring a case or controversy within the courts of Delaware."[88] Even so, Delaware courts may apply them differently. "Unlike the federal courts, where standing may be subject to stated constitutional limits,"[89] Delaware courts derive their adjudicative authority from the "plenary and unenumerated powers" of state sovereignty.[90] As a result, Delaware courts "may

---

[86] *In re Del. Pub. Schs. Litig.*, 239 A.3d at 510.

[87] *Dover Hist. Soc'y*, 838 A.2d at 1111 (quoting *Stuart Kingston*, 596 A.2d at 1382).

[88] *Id.* at 1111.

[89] *Id.*

[90] *In re Del. Pub. Schs. Litig.*, 239 A.3d at 510.

27

impose more lenient standing requirements than federal courts[.]"[91]  After all, "state courts are not bound by . . . federal rules of justiciability[.]"[92]  State courts may keep ajar the courthouse doors federal law has shut.[93]

The remedial flexibility afforded to state courts is reflected in the Delaware Constitution.  Under the Delaware Constitution, courts are open to "every person" who suffers an injury.[94]  Given this constitutional guarantee, Delaware courts, unlike federal courts, have "a duty to afford a remedy for every substantial wrong[.]"[95]  Indeed, "somewhat uniquely," Delaware provides "a remedy at law for any injury."[96]

Delaware's permissive approach to standing is reinforced by its "historic and constitutional separation of law and equity."[97]  "Historically, equity jurisdiction has

---

[91] *Id.* (internal quotation marks omitted).

[92] *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989).

[93] *See In re Del. Pub. Schs. Litig.*, 239 A.3d at 510 ("Based on the structure of our cooperative federal system, state court standing doctrine is appropriately more flexible than federal standing doctrine, because the state courts play a different and more expansive role than the federal courts.").

[94] Del. Const. art. I, § 9.

[95] Randy J. Holland, *The Delaware State Constitution* 75 (2d ed. 2017).

[96] Maurice A. Hartnett, III, *Delaware's Charters and Prior Constitutions*, *in The Delaware Constitution of 1897: The First One Hundred Years* 29 (Randy J. Holland & Harvey Bernard Rubinstein eds., 1997).

[97] *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 738 (Del. 1983).

taken its shape and substance from the perceived inadequacies of the common law and the changing demands of a developing nation."[98] "The Court of Chancery thus 'has an expansive power[] to meet new exigencies' and 'to meet changing needs.'"[99] And that power may bestow relief "a court of law . . . would be powerless to give[.]"[100] Accordingly, this Court may adapt or reshape existing "doctrine[,]" like standing, "to new relations[,]" and existing "remedies[,]" like an injunction, to "new circumstances[.]"[101] Where law leaves a gap, equity may fill it.

Founded on equity, this Court's power "to hear claims has always been . . . broad and flexible."[102] But it is not alone. All "Delaware courts can and do apply the principles of standing more broadly than their federal counterparts[.]"[103] And they have done so in cases, like this one, where an individual citizen challenges laws affecting the entire citizenry.

---

[98] *Schoon v. Smith*, 953 A.2d 196, 204 (Del. 2004) (internal quotation marks omitted).

[99] *In re Del. Pub. Schs. Litig.*, 239 A.3d at 511 (quoting *Schoon*, 953 A.2d at 205 n.24, 206)).

[100] *Schoon*, 953 A.2d at 205 (internal quotation marks omitted).

[101] *Id.* at 204–05 (internal quotation marks omitted).

[102] *In re Del. Pub. Schs. Litig.*, 239 A.3d at 511; *see Monroe Park*, 457 A.2d at 737 ("[E]quity regards substance rather than form.").

[103] *In re Del. Pub. Schs. Litig.*, 239 A.3d at 512.

For example, the Delaware Supreme Court has recognized taxpayer standing,[104] "[e]ven absent a showing of particularized injury," to challenge use of public funds.[105] Federal courts, by contrast, have required taxpayers to satisfy all standing elements, including injury in fact.[106] By relaxing injury in fact—the "quintessence of standing"[107]—in cases involving issues of public concern and government accountability, Delaware law has shown a willingness to look beyond "federal complexities and technicalities involving standing . . . in favor of [a] just . . . determination on the ultimate merits."[108]

Given Delaware's willingness to recognize standing in cases involving public issues that affect all citizens, it is reasonable to conclude that public interest concerns are relevant factors in deciding whether an individual citizen has established an injury in fact. Prudential standing and the public interest, in many ways, are related. Here, they arguably go hand-in-hand.

---

[104] *See City of Wilm. v. Lord*, 378 A.2d 635, 637–38 (Del. 1977).

[105] *Reeder v. Wagner*, 2009 WL 1526945, at *2 (Del. June 2, 2009) (TABLE).

[106] *See* John Dimanno, *Beyond Taxpayers' Suits: Public Interest Standing in the States*, 41 Conn. L. Rev. 639, 646–56 (2008).

[107] *Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*, 2019 WL 2319284, at *9 (Del. Ch. May 30, 2019).

[108] *In re Del. Pub. Schs. Litig.*, 239 A.3d at 510 (internal quotation marks omitted).

Plaintiffs base their standing on an issue of fundamental public importance: voting. They allege that the Vote-by-Mail Statute will undermine the upcoming General Election by allowing unconstitutional votes to be counted. And those illegal votes may be decisive, Plaintiffs' urge, because it is not uncommon for state elections to be decided by a hair.[109] For Higgin, a political candidate, and Mennella, an anticipated election official, an election implicating votes cast in contravention of the Delaware Constitution may have significant real-life consequences.

Plaintiffs' concerns raise more than voting dilution. They strike at the voting right itself. Plaintiffs, like all voters, have a right to participate in free and fair elections under which all votes legally made—and only votes legally made—count.[110] Regardless of how laudable the purpose behind the Vote-by-Mail Statute may be, the statute cannot introduce into the General Election votes prohibited under the Delaware Constitution. Plaintiffs adequately allege that it could. Accordingly, they have stated an injury in fact.

---

[109] *Cf.* Summ. J. Arg. Tr. at 65:10–22 (Higgin Plaintiffs' Counsel discussing triple recount incident involving the State of Washington that revealed improperly rejected votes and ultimately led to a gubernatorial victory by a slim margin).

[110] *See* Del. Const., art. I, § 3 ("All elections shall be free and equal.").

### b.    Shared Grievances

To reach the opposite conclusion, Defendants try to generalize Plaintiffs' injuries.  They reason that if everyone is harmed by an illegal vote, then no one is harmed by an illegal vote.[111]  When made by the Department of Elections, this argument is, at best, ironic.  From a standing standpoint, it makes little sense.

Generalized grievances defeat standing.  But to be generalized, an injury must be "not only widely shared, but . . . also of an abstract and indefinite nature[.]"[112]  The mere fact that an injury is felt by many does not make the injury abstract.[113]  Stated conceptually, an injury that is shared also may be particular and concrete.[114]

The Delaware Supreme Court has adopted this reasoning.  In *Dover Historical*, the Delaware Supreme Court held that an "aesthetic" injury may establish standing.  To reach that conclusion, the Delaware Supreme Court distinguished a general or abstract injury from a shared injury.  General or abstract harm does not

---

[111] *See* Defs.' Opening Br. at 21 ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters experienced a generalized injury." (internal quotation marks omitted)).

[112] *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23 (1998).

[113] *See Lynn*, 408 F. Supp. at 1332 (Even if "a benefit hardly can be quantified," a "loss of it [still may] support a finding of standing."); *accord Dover Hist. Soc'y*, 838 A.2d at 1112.

[114] *See Massachusetts v. EPA*, 549 U.S. 497, 522 (2007) ("Where a harm is concrete, though widely shared, the Court has found 'injury in fact.'") (alteration and citation omitted).

supply a person with standing.  But a shared injury might: "the fact that a grievance is widely held does not make it abstract and not judicially cognizable if individual plaintiffs can demonstrate a concrete and particularized injury."[115]

If aesthetic injuries, even when shared, may be sufficiently particular and concrete to confer standing on an individual aesthete, then it surely follows that injuries to fundamental rights—*e.g.*, voting—even when shared, may be sufficiently particular and concrete to confer standing on an individual voter.[116]  After all, "the right to vote in a *free and equal election* is not simply a right enshrined in Delaware's Constitution; it is the fundamental right on which our democracy rests."[117]  Given the fundamental nature of voting to our form of government, I think it should be plain that Plaintiffs have standing to challenge the Vote-by-Mail Statute.[118]

---

[115] *Dover Hist. Soc'y*, 838 A.2d at 1113.

[116] *See Akins*, 524 U.S. at 24 ("Thus the fact that a political forum may be more readily available where an injury is widely shared . . . does not, by itself, automatically disqualify an interest for Article III purposes.  Such an interest, where sufficiently concrete, may count as an 'injury in fact.'  This conclusion seems particularly obvious where (to use a hypothetical example) . . . large numbers of voters suffer interference with voting rights conferred by law.").

[117] *League of Women Voters of Del., Inc. v. Dep't of Elections*, 250 A.3d 922, 925 (Del. Ch. 2020) (emphasis added).

[118] Although I do not rely on legislative history to find standing, the pre-enactment debates surrounding the Vote-by-Mail Statute are illuminating.  At least some Delaware legislators expected the Vote-by-Mail Statute to prompt judicial review.  *See, e.g.*, 151st Gen. Assemb. Senate – 35th Legislative Day – Session 2 at 11:54:57 P.M (Senator Gay); 151st Gen. Assemb. House – 33rd Legislative Day – Session 2 at 6:48:30 P.M (Speaker

In any event, Plaintiffs' injuries are not generalized. The harm to voters who do comply with the requirements for voting under the Delaware Constitution is distinct from the harm to voters who do not. The harm may be shared by all the members of the compliant group, but it is no less personal to each group member.[119]

If illegal voting laws do not cause particularized harm to voters, then no voter would ever have standing to challenge illegal elections. Despite the gravity of such an outcome for the individual right to vote, Defendants say, in effect, "too bad." According to Defendants, "the assumption that if [Plaintiffs] have no standing to sue, then no one would have standing, is not a reason to find standing."[120] On different facts, that may be correct. But on these facts, Defendants' position lacks merit.

*Dover Historical* remains instructive. There, the Delaware Supreme Court encountered the same generalized grievance argument Defendants make here. In rejecting that argument, the Delaware Supreme Court discussed a Third Circuit case,

---

Schwartzkopf). These statements further support a conclusion that, in approving the Vote-by-Mail Statute, the legislature (or at least some members thereof) envisioned judicial review—and concomitant standing.

[119] *See Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449–50 (1989) ("The fact that other citizens or groups of citizens might make the same complaint . . . does not lessen [their] asserted injury . . . .").

[120] Def.' Reply Br. in Supp. of Mot. for Summ. J. at 7 (C.A. No. 2022-0641-NAC, Dkt. 32) (internal quotation marks and emphasis omitted).

*Society Hill Towers*,[121] approvingly. *Society Hill Towers* involved a challenge by a group of residents of a historic neighborhood to a state grant permitting the City of Philadelphia to modernize the area. The City argued that the individual residents lacked standing because the asserted harm would affect all residents generally.

The court of appeals disagreed. It reasoned that if the residents could not challenge the state grant, then no one could. In *Dover Historical*, the Delaware Supreme Court accepted that analysis, describing it as "apt:"

> The [Third Circuit] determined: "it is clear that the [residents of the historic district] are alleging injury to a legally protected interest—that of maintaining the environmental and historic quality of their neighborhood." The [Third Circuit] *aptly noted* that if the residents of the historic district in the City of Philadelphia did "not have standing to protect the historic and environmental quality of their neighborhood, it is hard to imagine that anyone would have standing to oppose this UDAG grant. If that is the case, the requirement for public hearings, and public input would be little more than a meaningless procedural calisthenic that would provide little or no protection to those most directly affected by the governmental action—the people who live in the vicinity of a federally funded project and who lives are most directly impacted by the expenditure of UDAG funds."[122]

---

[121] *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168 (3d Cir. 2000).

[122] *Dover Hist. Soc'y*, 838 A.2d at 1113 (second alteration in original) (emphasis added) (quoting *id.* at 176).

So too here. Voting rights are plainly within the zone of interest implicated by the Vote-by-Mail Statute and the Delaware Constitution.[123] Defendants do not contend otherwise. Yet, in Defendants' view, no voters could vindicate harm caused by the Vote-by-Mail Statute because, in that scenario, every voter would be harmed by it. Taking that theory to its logical extreme, no one covered by the Vote-by-Mail Statute would have standing to challenge it.[124] *Dover Historical* forecloses this result.

Public interest considerations likewise undermine Defendants' position. In a representative system of government, voting plays a vital role. Citizens generally cannot direct the actions of officials once they are elected. Instead, citizens exercise direct influence via the ballot box. That is why "'the right to vote is accorded

---

[123] *See Gannett Co.*, 565 A.2d at 897 (requiring merely that asserted interest be "*arguably* within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question") (emphasis added); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) ("[W]e have always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff."); *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 403 (1987) (finding asserted interest to fall within relevant zone of interest where interest had "plausible relationship to the policies underlying" disputed statute).

[124] Indeed, when pressed to identify who, if anyone, would have standing under the Vote-by-Mail Statute, Defendants initially argued that no voter would, *see* Summ. J. Arg. Tr. at 78:17–23, and then speculated that DOE "probably would have standing" and Board of Canvass members "might have standing . . . hypothetically[,]" *id.* at 79:20–21, 79:24–80:1.

extraordinary treatment[.]'"[125]  Without it, "a citizen cannot hope to achieve any meaningful degree of individual political equality if granted an inferior right of participation in the political process."[126]  Laws that permit citizens to vote in a manner inconsistent with our Constitution harm a citizen's basic right to elect representatives of her choosing.

If I were to adopt Defendants' argument on standing, I would endorse a scenario where the legislature could, by simple majority, adopt voting laws in violation of the Delaware Constitution that no Delaware citizen can challenge because the harm of such laws would be "generalized" to all Delaware voters.  For a host of reasons, that seems unwise.

To be sure, there are sound practical reasons counseling against granting standing to a plaintiff who bases a challenge to state action unrelated to voting on the sole fact that the plaintiff is a voter.  This decision does not suggest otherwise.  But when the challenge is directed to laws governing voting itself, the analysis is different.  In that latter setting, meritless challenges can be addressed on the

---

[125] *Young v. Red Clay Consol. Sch. Dist.*, 122 A.3d 784, 831 (Del. Ch. 2015) (alteration omitted) (quoting *Plyler v. Doe*, 457 U.S. 202, 233 (1982)).

[126] *Id.* at 832 (internal quotation marks omitted).

merits.[127]    At this standing stage, all that matters is whether Plaintiffs are proper claimants to challenge the Vote-by-Mail Statute.  They are.

In sum, Plaintiffs have standing to challenge the Vote-by-Mail Statute.  I proceed to the merits.

## C. Plaintiffs Have Not Demonstrated Actual Success on the Merits on Their Same-Day Registration Statute Claim But Have Demonstrated Actual Success on the Merits on Their Vote-by-Mail Statute Claim

Having decided to proceed on the merits, my next inquiry is whether the elements for a permanent injunction have been met—the first of which is that the plaintiff must demonstrate actual success on the merits.  In this case, that means Plaintiffs must prove that the Vote-by-Mail Statute and the Same-Day Registration Statute are unconstitutional.  For the reasons explained below, I am persuaded that Plaintiffs have proven success on the merits only as to their challenge to the Vote-by-Mail Statute.  The Higgin Plaintiffs have not proven success on the merits as to their challenge to the Same-Day Registration Statute.

### 1. Broad Legislative Power

Before discussing canons of construction that aid the Court in considering the constitutionality of legislative enactments, I begin by acknowledging the broad

---

[127] *See Stuart Kingston*, 596 A.2d at 1382 (At the standing stage, courts are not "concerned . . . with the merits of the subject matter of the controversy.").

legislative powers the Delaware General Assembly wields. Article II, Section 1 of the Delaware Constitution provides that "[t]he legislative power of this State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives."[128]

Instead of granting only certain enumerated legislative powers as the United States Constitution does, the Delaware Constitution "limits the powers which the state inherently possesses as a sovereign entity. Only provisions of Delaware's Constitution as well as the United States Constitution restrain the General Assembly's legislative power . . . ."[129] Nearly 100 years ago, our Supreme Court acknowledged this "familiar principle which is nowhere questioned"; namely, "that in the American States, as distinguished from the Federal Government, the legislative power is as broad and ample in its omnipotence as sovereignty itself, except in so far as it may be curtailed by constitutional restrictions express or necessarily implied."[130]

As our Supreme Court stated in *Opinion of the Justices*:

The answer to [a question posed by the governor] lies in the fundamental precept that the General Assembly has all legislative power not expressly or impliedly limited by the Constitution. The

---

[128] Del. Const. art. II, § 1; *see also* Appx. A.

[129] Randy J. Holland, *The Delaware State Constitution* 91–92 (2d ed. 2017).

[130] *Collison v. State*, 2 A.2d 97, 100 (Del. 1938).

'legislative hand is free except as the constitution restrains.' This is sometimes known as the residual power doctrine.

Accordingly, it is not necessary to find in the Constitution an express grant to the General Assembly of authority to provide for absentee voting in primary elections; the inquiry is whether there is any limitation in the Constitution upon the power of the General Assembly to do so. In the absence of such constitutional limitation, the power of the General Assembly to provide for [the law at issue] is unquestionable.[131]

Thus, I agree with Defendants that "the inquiry is not whether the Delaware Constitution *permits* the General Assembly to enact the statute. The inquiry is whether any constitutional provisions *prohibit* the General Assembly from passing such legislation."[132] Concerning election laws, the General Assembly has broad authority under Article V, Section 1 of the Delaware Constitution to "prescribe the means, methods and instruments of voting so as best to secure secrecy and the independence of the voter, preserve the freedom and purity of elections and prevent fraud, corruption and intimidation thereat."[133] This Court has recognized the "transcending public importance" of election laws, which "touch upon [and] give vitality to the most fundamental of our rights."[134]

---

[131] *Op. of the Justices*, 295 A.2d 718, 720 (Del. 1972) (quoting *Collison*, 2 A.2d at 108).

[132] Defs.' Opening Br. at 27 (emphasis in original).

[133] Del. Const. art. V, § 1.

[134] *Bartley v. Davis*, 1986 WL 8810, at *9 (Del. Ch. Aug. 14, 1986).

## 2. Presumption of Constitutionality and Other Canons of Construction

With this backdrop in mind, I turn next to principles of constitutional construction. "The legislative hand is free except as the constitution restrains."[135] "'It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it.' Therefore, 'an act of the legislature, repugnant to the constitution, is void.'"[136]

Although the Delaware Constitution trumps any conflicting statute, "[e]nactments of the Delaware General Assembly are presumed to be constitutional."[137] Indeed, this presumption is "strong"[138] and can be overcome only by "clear and convincing evidence of unconstitutionality."[139] Delaware courts "ha[ve] a duty to read statutes 'so as to avoid constitutional questionability and

---

[135] *Op. of the Justices*, 295 A.2d at 720 (quoting *Collison*, 392 A.2d at 108).

[136] *Evans v. State*, 872 A.2d at 553 (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)).

[137] *Hoover v. State*, 958 A.2d 816, 821 (Del. 2008).

[138] *Monceaux v. State*, 51 A.3d 474, 477 (Del. 2012).

[139] *Sierra v. Dep't of Servs. for Child., Youth & their Families*, 238 A.3d 142, 155–56 (Del. 2020) (citing *Monceaux*, 51 A.3d at 477); *see also League of Women Voters of Del., Inc. v. Dep't of Elections*, 250 A.3d at 926 ("Statutes enjoy a presumption of constitutionality, and I may not invalidate . . . state statutes on ground of unconstitutionality unless that unconstitutionality is clear.").

patent absurdity.'"[140] This presumption assists the court in exercising proper judicial restraint and "requires deference to legislative judgment in matters 'fairly debatable.'"[141] And our Supreme Court has counseled us to give "great weight" to the "General Assembly's articulation of public policy."[142]

At the same time, our Supreme Court is also clear that "the Constitution and each part thereof must be harmonized and construed as a whole; that it cannot be presumed that any clause of the Constitution is intended to be without full force and effect."[143] Indeed, such a rule is "[c]ardinal" in our law.[144] In addition, Delaware courts are charged to interpret the Constitution in a way to avoid "produc[ing] an irrational result."[145] That interpretation is not policy-driven, however; "[t]he ruling must come from the interrelationship of concepts set forth in the Constitution, the

---

[140] *Monceaux*, 51 A.3d at 477 (quoting *Op. of the Justices*, 295 A.2d at 721–22).

[141] *Helman v. State*, 784 A.2d 1058, 1068 (Del. 2001) (quoting *Wilm. Med. Ctr., Inc. v. Bradford*, 382 A.2d 1338, 1342 (Del. 1978)).

[142] *Id.*

[143] *State v. Roberts*, 282 A.2d 603, 606 (Del. 1971); *see also Op. of the Justices*, 225 A.2d 481, 484 (Del. 1966).

[144] *Roberts*, 282 A.2d at 606.

[145] *Id*. (quoting *Op. of the Justices*, 225 A.2d at 484).

language of the Constitution, and the prior case law that has construed the Constitution."[146]

### 3. The Same-Day Registration Statute

The Higgin Plaintiffs (but not the Miles Plaintiffs) challenge the Same-Day Registration Statute with respect to the General Election. In particular, the Higgin Plaintiffs argue that the Same-Day Registration Statute violates Article V, Section 4 of the Delaware Constitution. In particular, the Higgin Plaintiffs focus their analysis and arguments on the following italicized language in the second paragraph of Article V, Section 4:[147]

> There shall be at least two registration days in a period commencing not more than one hundred and twenty days, nor less than sixty days before, and ending not more than twenty days, *nor less than ten days before, each General Election*, on which registration days persons whose names are not on the list of registered voters established by law for such election, may apply for registration, and on which registration days applications may be made to strike from the said registration list names of persons on said list who are not eligible to vote at such election; provided, however, that such registration may be corrected as hereinafter provided *at any time prior to the day of holding the election*.[148]

---

[146] *State ex rel. Gebelein v. Killen*, 454 A.2d 737, 747 (Del. 1982); *see id.* ("Our view of the best policy does not govern."). I note that the Supreme Court subsequently disavowed dicta in *Killen*; that dicta is not relevant here. *State ex rel. Oberly v. Troise*, 526 A.2d 898, 900–901 (1987).

[147] *See* Appendix A to this Opinion for the full text of Article V, Section 4.

[148] Del. Const. art. V, § 4 (emphasis added).

43

The Higgin Plaintiffs say that this language requires that voter registration end at least ten days before the General Election and corrections conclude prior to the date of the election. They claim that, because the Same-Day Registration Statute permits registration on the same day as the General Election, the law is unconstitutional.

I begin my analysis of the Same-Day Registration Statute with an understanding that it is my "duty to read statutory language so as to avoid constitutional questionability" as well as "patent absurdity."[149] With this command in mind, I find Plaintiffs' argument unpersuasive.

The language at the beginning of the applicable section states that "there shall be *at least* two registration days" within the time period specified. A plain-language reading of Section 4 suggests that it provides for a *minimum* period of registration, and the Same-Day Registration Statute providing for additional days would not disturb that constitutionally-protected minimum.

Similarly, the proviso at the end of the second paragraph of Section 4—that "such registration may be corrected as hereinafter provided at any time prior to the day of holding the election"—does not, in my view, foreclose the possibility of same-day registration. The Higgin Plaintiffs would, in essence, have me modify the constitutional text so that "such registration" instead reads as "all registration" and,

---

[149] *Op. of the Justices*, 295 A.2d at 721-22.

in doing so, insert an implied limitation on legislative power into Section 4 that does not appear in the plain text.  As I understand my duty in this context, however, I should avoid inserting judicially-created implied limitations into the plain text of the Constitution absent clear evidence that the implied limitation is required.  With that understanding, I believe a reasonable interpretation of the proviso is that "such registration" refers to registrations described in the immediately preceding passage and is silent as to registrations occurring on the day of the general election.[150]

I also understand that reasonable minds may disagree on these points.  In analyzing the constitution, however, my duty is not to seek out ways to invalidate statutes.  To the contrary, under the doctrine of constitutional avoidance, I believe my duty is to consider whether a reasonable interpretation supports the validity of the statute and only find constitutional invalidity when I have clear and convincing evidence of such invalidity.

The Higgin Plaintiffs rely on *State ex rel. Walker v. Harrington*, decided in 1943, for the proposition that Section 4 requires all issues of voter eligibility to be resolved prior to election day.[151]  In my view, *Harrington* cannot support the entire

---

[150] Yet another reasonable interpretation is that the proviso concerns "corrections" to registration and is therefore, once again, silent as to registrations that occur for the first time on the day of the general election, as there is nothing to "correct."

[151] 30 A.2d 688 (Del. 1943).

weight of the Higgin Plaintiffs' argument. In that case, the Court considered the constitutionality of the aptly termed "Soldiers' Vote Act," which enabled qualified voters in the military "to exercise the right of suffrage" by voting from "their place of encampment" instead of the "election district or ward of their residence."[152] In passing, the Court stated that Section 4 of Article V "prescribed for uniform laws for registration of voters for the purpose of determining that prospective voters duly possess the necessary and prescribed qualifications" and "provides that all questions of the qualifications of voters should be determined before election day, and on that day, beyond the fact of the identity of the persons, the sole ground of challenge should be the violation of said Section 3 of Article V."[153]

There can be no question that this language, at least indirectly, supports the Higgin Plaintiffs' argument. The *Harrington* Court summarized Section 4 as signaling that "all questions of the qualifications of voters should be determined *before election day*." But this language is dicta.[154] The Court did not *hold* that Section 4 is so limited but described it so in passing. In addition, as Defendants

---

[152] *Id.* at 690.

[153] *Id.* at 691.

[154] *See, e.g.*, *Nelson v. Frank E. Best Inc.*, 768 A.2d 473, 483 (Del. Ch. 2000) ("Indeed, perhaps the *most* well-settled proposition of common law is that dictum does not constitute binding precedent.") (emphasis in original); *Op. of the Justices*, 198 A.2d at 690 ("It is a well-settled rule of law that statements amounting to mere *obiter dicta* do not become binding precedents and fall outside the rule of *stare decisis*.").

point out, the language used—"*should* be determined"—suggests that it is not mandatorily limited as such. At bottom, while the *Harrington* court summarized what it viewed Section 4's function to be, it did not foreclose the plain language interpretation I adopt here.

In addition, the construction offered by the Higgin Plaintiffs would render other (unchallenged) parts of the election laws unconstitutional. The Higgin Plaintiffs do not challenge the registration statutes on the basis of when individuals can *begin* registering and, indeed, since 1993, Title 15 has enabled individuals to register to vote at the time they apply for a motor vehicle driver's license with the Division of Motor Vehicles and other state agencies.[155] Construing Article V, Section 4 to cabin all registration dates to those enumerated therein, instead of providing a constitutional baseline, would render these (unchallenged) statutes unconstitutional as well. Such a result is to be avoided if possible.[156] Here, it is not only possible but in alignment with the plain language of the Constitution itself.

---

[155] *See* 15 *Del. C.* § 2050.

[156] *See, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court."); *Op. of the Justices*, 295 A.2d at 722 ("We are required to give to statutory language a reasonable and suitable meaning; it is to be presumed that the Legislature did not intend an unreasonable, absurd, or unworkable result.").

Finally, Article V, Section 4 was subject to a quite significant amendment in 1925. The original version of Article V, Section 4, as included in the Delaware Constitution of 1897, provided in relevant part:

> The General Assembly shall provide by law for a uniform biennial registration of the names of all the voters in this State who possess the qualifications prescribed in this Article, which registration shall be conclusive evidence to the election officers of the right of every person so registered to vote at the general election next thereafter . . . .

> Such registration shall be commenced not more than one hundred and twenty days nor less than sixty days before and *be completed* not more than twenty days nor less than ten days before such election. Application for registration may be made on at least five days during the said period; provided, however, that such registration may be corrected as hereinafter provided, at any time prior to the day of holding the election.[157]

In 1925, the General Assembly amended Article V, Section 4 (i) to delete the requirement for biennial registration and (ii) to replace Section 4 with the current version of the text.[158] In doing so, the General Assembly struck the requirement that registration "be completed" not less than ten days before the General Election.[159]

---

[157] Del. Const. of 1897, art. V, § 4 (emphasis added).

[158] 34 Del. Laws ch. 1 (1925). The General Assembly also amended Section 4 in 1907 to remove the requirement to pay a registration fee. *See* 24 Del. Laws ch. 7 (1907). This amendment, however, is not relevant to the Same-Day Registration Statute.

[159] *Id.* The parties unfortunately did not identify this amendment in their briefing. The Court requested that the parties be prepared to address the amendment during oral argument. Dkt. 33. Defendants' counsel argued that removal of the "be completed" language, particularly when read in connection with the removal of the requirement for biennial voter registration, indicated that the General Assembly revised Article V, Section

48

The Higgin Plaintiffs' primary focus is on Section 4's reference to a registration period preceding the general election. The Higgin Plaintiffs' argument, however, fails to grapple with the unambiguous deletion of "be completed" from the text. The Higgin Plaintiffs ignore two key points. First, the 1897 version of the Constitution required biennial registration that "shall be commenced" by a certain number of days before the general election and "shall . . . be completed" no fewer than "ten days before such election." Second, the 1925 amendment to the Constitution replaced the 1897 text with vastly less restrictive language, disposing of narrow biennial registration in favor of mandating only a constitutional minimum of "at least two registration days in a period" before "each General Election . . . ."[160] I believe it would be inconsistent with principles of constitutional analysis for me to ignore this very significant change to the text of Article V, Section 4 in analyzing the Higgin Plaintiffs' challenge. To the contrary, it is my view that the amendment not only supports my prior reasoning, but also independently compels the conclusion

---

4 to provide for a minimum number of registration days before each General Election, not to cabin the number of such days. Summ. J. Arg. Tr. 116–17. Plaintiffs' counsel disagreed and explained that they did not attach any significance to this amendment insofar as it concerns the Same-Day Registration Statute. *Id.* at 50–55.

[160] Notably, *Harrington* does not consider the 1925 amendment at all, which is unsurprising given that its passing reference to registration was dicta.

that the Higgin Plaintiffs have failed to show clear evidence that the Same-Day Registration Statute violates the Delaware Constitution.

Finally, it bears repeating that the express purpose of election laws in this state is to provide for "free and equal" elections[161] where Delawareans have an "unfettered" right to vote[162]—one of "the most fundamental of our rights."[163] The General Assembly has determined that the Same-Day Registration Statute would enhance "meaningful participation from [Delaware's] citizenry."[164] This is entitled to "great weight" in the Court's review of its constitutionality. "Clear and convincing evidence of unconstitutionality" is what would be needed to overturn this law,[165] and the evidence in this case simply falls short of that mark.

In sum, despite *Harrington*'s dicta, given the plain language of Section 4, the strong presumption of constitutionality, and the advisability of keeping the existing statutory scheme harmonious, I cannot conclude the Same-Day Registration Statute is clearly unconstitutional such that the Higgin Plaintiffs have proven success on the merits of their claim.

---

[161] *See* Del. Const. art. I, § 3.

[162] *See Young*, 122 A.3d at 857 (quoting *Abbott v. Gordon*, 2008 WL 821522, at *19 (Del. Ch. Mar. 27, 2008)).

[163] *Bartley*, 1986 WL 8810, at *9.

[164] *See Republican State Comm.*, 250 A.3d at 921.

[165] *See Sierra*, 238 A.3d at 155–56.

50

### 4. The Vote-by-Mail Statute

I turn next to the Vote-by-Mail Statute. Plaintiffs assert that the Vote-by-Mail Statute is unconstitutional on two grounds. Plaintiffs argue that the Delaware Constitution only allows for absentee voting in limited, enumerated circumstances, as contained in Article V, Section 4A. Plaintiffs also argue that that the Vote-by-Mail Statute violates the Delaware Constitution's requirement that an election be held on one day as expressed in Article V, Section 1. Because I conclude that the Vote-by-Mail Statute is inconsistent with Article V, Section 4A—as it has been interpreted in case law—I do not reach Plaintiffs' challenge under Article V, Section 1.

### a. Prior Vote-by-Mail Statute

The Vote-by-Mail Statute is not the General Assembly's first effort to pass a general vote-by-mail law; nor is this litigation the first challenge to such a law. In 2020, the Court of Chancery considered a very similar vote-by-mail statute in *Republican State Committee*. In that action, the plaintiffs challenged a 2020 statute passed by the General Assembly that allowed for mail-in voting by all Delaware voters for the 2020 election.[166] The General Assembly approved the 2020 statute

---

[166] *Republican State Comm.*, 250 A.3d at 912–13. During oral argument, Defendants' counsel acknowledged that the 2022 Vote-by-Mail Statute employed much of the same text as the 2020 statute and that the only material difference is that, under the Prior Vote-by-Mail Statute, all voters automatically received an application to vote by mail whereas

under its emergency powers in Article XVII, Section 1 of the Delaware Constitution, which permits legislative action to "[e]nsure the continuity of State and local governmental operations in periods of emergency."[167] Vice Chancellor Glasscock noted that, in light of the COVID-19 pandemic, the legislature "made a determination that vote-by-mail is necessary for the continued operation of governmental functions, and that it would be impracticable to address this problem other than by otherwise-extraconstitutional means."[168] The Vice Chancellor concluded that the General Assembly's "findings [were] not clearly erroneous" and therefore denied the plaintiffs' motion for summary judgment.[169]

In the course of his analysis, the Vice Chancellor also noted that the parties to that litigation did not dispute that the 2020 vote-by-mail statute would be impermissible but for the General Assembly's invocation of its emergency powers:

> The parties agree that *the list in Article V, § 4A of those citizens entitled to vote by absentee ballot is meant to be exhaustive*. Thus, the General Assembly may only expand remote voting beyond that list by properly invoking the emergency powers of Article XVII, § 1 to "[e]nsure the continuity of State and local governments."

---

voters must request such an application under the current Vote-by-Mail Statute. Summ. J. Arg. Tr. at 99.

[167] Del. Const. art. XVII, § 1; *see also* Appx. A for full text of Article XVII.

[168] *Republican State Comm.*, 250 A.3d at 922.

[169] *Id.*

. . . [Section 4A] provides a list of reasons for which a registered voter may submit an absentee ballot to be counted in a general election. The need for social distancing to minimize public health risks is not on that list, nor do the Defendants argue that it is, and *the list is meant to be exhaustive. Therefore, absent some other authority, Article V, § 4A prohibits the General Assembly from allowing general absentee voting* for the November 4, 2020 general election based on the threat posed by the COVID-19 virus.[170]

In stating that Section 4A's list is meant to be "exhaustive," the Vice Chancellor cited to *Opinion of the Justices*, 295 A.2d 718 (Del. 1972).

### b. Prior Constitutional Case Law on Absentee Voting

In *Opinion of the Justices*, an advisory opinion, the Supreme Court of Delaware answered three questions posed to the Supreme Court by Delaware's Governor in 1972.[171] Each of the Governor's questions concerned primary elections. In the course of providing the Supreme Court's views on primary election laws, the Supreme Court added a "caveat as to general elections":

[Article 5, Section 4A of the Delaware Constitution] specifically enumerates the classifications of persons eligible to vote by absentee ballot at general elections. We are of the opinion that by expressly including certain classifications, the drafters of s 4A impliedly excluded all other classifications. *It is beyond the power of the Legislature, in*

---

[170] *Id.* at 917–18 (emphasis added); *accord id*. at 913 ("The DOE concedes that the Delaware Constitution lists reasons for which ballots may be provided for absentee voting, that this list of reasons is intended to be comprehensive, and that the current epidemic health crisis is not among them."); *id.* at 917 ("The General Assembly, via the Act, has extended eligibility for remote voting beyond those electors entitled to so vote by Article V, § 4A of the Delaware Constitution. The parties agree that the list in Article V, § 4A of those citizens entitled to vote by absentee ballot is meant to be exhaustive.").

[171] *Op. of the Justices*, 295 A.2d at 720.

*our opinion, to either limit or enlarge upon the s 4A absentee voter classifications specified in the Constitution for general elections.*[172]

On this basis, the Supreme Court explained that certain classifications in the statute under consideration would be "unconstitutional limitations" and other classifications in the statute would be "an unconstitutional enlargement" of absentee voting, "insofar as general elections are concerned . . . ."[173] The Supreme Court, however, acknowledged that its statements and conclusion as to general elections were not necessary to its analysis, writing: "While the questions before us are confined to primary elections, we have taken the occasion to raise this caveat as to general elections for the timely consideration of all concerned."[174]

The *Opinion of the Justices* advisory opinion does not cite any case law in support of the passage described above. However, an earlier passage in the advisory opinion points the way:

> We have considered the force and effect of *State ex rel. Walker v. Harrington*, and *State v. Lyons*. In each of those cases, the Court found in the Constitution an implied limitation upon absentee voting in general elections. Shortly after the *Harrington* decision, the Constitution was amended by adding s 4A to Article 5. It is clear that

---

[172] *Id.* at 722 (emphasis added).

[173] *Id.*

[174] *Id.* at 723.

> the holdings in *Lyons* and *Harrington* are limited to general elections,
> as are the provisions of the resultant Art. 5, s 4A.[175]

Thus, I look to the decisions in *Lyons* and *Harrington* for the source of the Constitution's "implied limitation upon absentee voting in general elections."[176]

In *Lyons*, the Delaware Court of General Sessions[177] considered the constitutionality of laws broadly allowing for qualified Delaware electors to vote by mail.[178] The court considered the constitutionality of the mail-in voting laws in connection with a criminal indictment against seven persons alleged to have committed conspiracy to abet fraud relating to casting votes under the law.[179] The

---

[175] *Id.* at 721.

[176] *Id.*

[177] Prior to 1951, Delaware did not have a formal supreme court. Instead, Delaware utilized a "left-over-judge" system whereby state judges who had not heard the case on appeal would serve as the tribunal of final appeal. Under this system, the Court of General Sessions, together with the Courts of Oyer and Terminer, sat as the higher criminal tribunals in the first instance. *See* Paul Dolan, *History of the Supreme Court*, 56 Dick. L. Rev. 166, 166–67 (1952) (available at https://courts.delaware.gov/supreme/history/history1.aspx). Therefore, for purposes of the *Lyons* case, which was a criminal case, the Court of General Sessions acted as the court of final appeal. In the *Lyons* case, two then-Superior Court Judges, the Honorable Richard Rodney and the Honorable Frank Speakman, sat on the appeal.

[178] *See* 33 Del. Laws ch. 103 (1923) (providing that "any qualified elector . . . who may be in the public service of the United States of America or of this State . . . or who because of the nature of his work or business, may be absent, or may expect to be absent, from this State . . . or who because of sickness or physical disability cannot appear at [his or her] polling place" may vote by mail-in ballot).

[179] *Lyons*, 5 A.2d at 496.

Delaware Court of General Sessions found the mail-in voting laws unconstitutional, holding that Article V, Section 2 "contemplates and requires the personal attendance of the voter at the polls, and no power now exists in the Legislature to provide for absentee voting."[180]  In its decision, "the Court relied on the debates of the 1897 Convention as well as Article V, Section 3's provision for challenging a voter on the grounds of bribery."[181]

In *Harrington*, the Delaware Supreme Court found the Soldiers' Vote Act, which allowed Delaware voters stationed at military encampments to vote in those encampments, to be unconstitutional.[182]  The question before the court was "whether the Constitution requires that the polling places for the reception of ballots be located within the geographical and territorial confines of the State of Delaware."[183]  As former Justice Holland wrote, the *Harrington* court acknowledged *Lyons* but ultimately concluded that polling places must be located within Delaware:

> The court did not disagree with the *Lyons* court's interpretation of Section 2, but was of the mind that "the question before the Court can only be determined by a consideration of all the material and pertinent provisions of the Constitution."  As in *Lyons*, the court relied on the right to challenge a voter

---

[180] *Id*. at 503.

[181] Randy J. Holland, *The Delaware State Constitution* 211 (2d ed. 2017).

[182] *Harrington*, 30 A.2d at 692–93; *see also* Randy J. Holland, *The Delaware State Constitution* 211 (2d ed. 2017).

[183] *Harrington*, 30 A.2d at 691.

on the grounds of bribery in Section 3, but also relied on Section 5's protection of electors while traveling to and from polling places and the inability of the Board of Canvass to bring before it election officers from outside the state and fulfill its duties as announced in Section 6.[184]

The framers of the 1897 Constitution were deeply concerned with vote buying and election fraud, which were considered rampant in Delaware at the time.[185] Indeed, these concerns were so paramount to the framers of the 1897 Constitution that they took the extraordinary step of laying out in great specificity the substance of the crimes of voter fraud and bribery within the Constitution.[186] The *Lyons* opinion also made note of this history. There, the court cited at length a quote from Judge Spruance at the 1897 Constitutional Convention, where he stated that the Convention had considered adopting the absentee voting provision provided under the New York Constitution but decided such a provision was not necessary.[187]

---

[184] Randy J. Holland, *The Delaware State Constitution* 211 (2d ed. 2017).

[185] Randy J. Holland, *The Delaware State Constitution* 26 (2d ed. 2017).

[186] *Id;* s*ee also* Randy Holland & Harvey Rubenstein, *The Delaware Constitution of 1897: The First One Hundred Years* 444 (stating that vote buying was ubiquitous in Delaware and that it was "the intention of the [1897] Constitutional Convention to put a stop to the pollution of the ballot") (citing *News Account Dated February 14, 1897*, Sunday Philadelphia Times Special Edition)).

[187] *Lyons*, 5 A.2d at 501–02. Judge Spruance specifically noted that the applicable provision in the New York Constitution was included to address absentee voting during the Civil War and that it was thought that "such an unfortunate condition of affairs . . . would not be likely to occur again." *Id.*

### c. Constitutionality of the Vote-by-Mail Statute

I now turn to the Vote-by-Mail Statute and the implication of this constitutional history. As discussed in Section I.C.2 herein, the Vote-by-Mail Statute allows qualified, registered voters to apply and request a mail-in ballot from the DOE.[188] As also previously noted, counsel for the Defendants at oral argument acknowledged that the current Vote-by-Mail Statute is not materially different from the Prior Vote-by-Mail Statute.[189] Furthermore, the General Assembly, in the Prior Vote-by-Mail Statute, specifically stated that the list of reasons permitting absentee voting under Article V, Section 4 of the Delaware Constitution is exhaustive and that the General Assembly passed the Prior Vote-by-Mail Statute pursuant to its emergency powers.[190]

Plaintiffs argue that the Vote-by-Mail Statute does not comport with Article V, Section 4A or the related statutory scheme. It simply provides that "[a] qualified, duly registered elector wishing to vote by mail" need only "[c]omplete a handwritten or electronic application to vote by mail," "[s]ign and date the application," and "[m]ail, deliver, or cause to be mailed or delivered, the completed application to the

---

[188] 83 Del. Laws ch. 353, § 5604(A) (2022).

[189] Summ. J. Arg. Tr. at 99.

[190] 82 Del. Laws ch. 245 (2020). *See* Section I.C.1.

Department by the deadline provided by the Department."[191] The elector must also sign an oath on the ballot but need not provide a reason why they cannot or chose not to vote by mail—it is available to anyone "wishing to vote by mail."[192]

Plaintiffs argue that this is in direct conflict with Article V, Section 4A, which they claim only allows those "who shall be unable to appear to cast his or her ballot at any general election at the regular polling place of the election district in which he or she is registered."[193] They also argue that this court's opinion in *Republican State Committee*[194] and the Delaware Supreme Court's *Opinion of the Justices*[195] support their construction.

After careful consideration, I conclude that, based on precedent, I am compelled to agree. The Vote-by-Mail Statute is functionally the same as the 2020 statute, with much of the same text and the only material difference being irrelevant to my analysis here.[196] Unlike in 2020, however, the General Assembly did not

---

[191] 83 Del. Laws ch. 353, § 5604A (2022).

[192] *Id.*

[193] Del. Const. art. V § 4A.

[194] 250 A.3d 991 (Del. Ch. 2020).

[195] 295 A.2d 718 (Del. 1972).

[196] *See* Summ. J. Arg. Tr. at 99:3–6 (Defendants acknowledging that the only material difference between the statutes is that, under the 2020 statute, mail-in ballots were distributed directly to voters, whereas the 2022 statute uses an opt-in system).

invoke its emergency powers in approving the Vote-by-Mail Statute in 2022. *Opinion of the Justices* provides clear guidance that the General Assembly may neither expand nor limit the categories of absentee voters identified in Article V, Section 4A.[197] The Vote-by Mail Statute, however, vastly expands the categories of such voters and, as such, is inconsistent with the Constitution.

Defendants argue that the language from *Republican State Committee* and *Opinion of the Justices* is not binding on this court. *Opinion of the Justices* is an advisory opinion given to the Governor, and in it the Justices acknowledged that "all questions before us are confined to primary elections." The language from *Republican State Committee* is likewise *dicta*, they say; as explained, the Vice Chancellor held that the General Assembly acted within its emergency powers under Article XVII, Section 1 of the Delaware Constitution when it enacted mail-in voting laws for the year 2020. In neither case did the court *hold* that no-excuse mail-in voting runs afoul Article V, Section 4A.

To a trial judge, Defendants' attempt to minimize the only precedent that has touched on this issue is, ultimately, unpersuasive. The language from both our Supreme Court and this court is unequivocal that Section 4A's list is exhaustive.

---

[197] *Op. of the Justices*, 295 A.2d at 722.

Indeed, the State appears to have conceded this very point just two years ago. More importantly, it is the only guidance given, and I am obliged to follow it.

Defendants also argue that there is an important distinction between mail-in voting and "absentee voting." According to Defendants, a Delawarean votes "absentee" when she is unable to come to the regular polling place, whereas mail-in voting refers to people present in the county who simply would prefer not to vote in-person. The Vote-by-Mail Statute is not unconstitutional, they say, because Section 4A deals with absentee voting, not mail-in voting generally, and *vice versa* for the Vote-by-Mail Statute.

Defendants offer no authority supporting this distinction. This court's 2020 opinion consistently used the terms interchangeably.[198] And Defendants agree that the 2020 statute is functionally the same as the Vote-By-Mail Statute. I cannot adopt a distinction that is contradicted by Delaware law and, frankly, common usage.

In addition, Plaintiffs argue that Defendants' attempt to draw a highly-nuanced distinction between absentee and mail-in voting unreasonably risks rendering Section 4A superfluous. The decision in *Lyons* rests on the question of

---

[198] *See Republican State Comm.*, 250 A.3d at 915 ("As signed into law by Governor John Carney on July 1, 2020, the Vote By Mail Statute amends Title 15 of the Delaware Code to allow voters who would not meet the usual requirements for absentee voting to vote by mail.").

whether a voter has appeared in-person at a polling place. To the Court in *Lyons*, this was the key constitutional question. The decision in *Harrington* comports with this understanding, as well. Thus, at least according to *Lyons* and *Harrington*—on which *Opinion of the Justices* relies—the constitutional fulcrum on which validity and invalidity turns is whether or not the voter is required to appear at the polling place and not simply how a vote is cast.

Under this reading of the case law, if both Section 4A and the Vote-By-Mail Statute enable citizens to vote without appearing in-person, and the Vote-By-Mail Statute is unlimited as to such eligibility, then the Vote-By-Mail statute necessarily would paint over the specific categories of eligible citizens enumerated in Section 4A. In short, permitting widespread voting by mail would—regardless of whether you call it absentee voting, mail-voting, or something else—improperly render Section 4A surplusage under *Lyons*, *Harrington*, and *Opinion of the Justices*.

Finding Delaware law to be no help, Defendants turn elsewhere. Citing *McLinko v. Department of State*,[199] a Pennsylvania decision, and *Lyons v. Secretary of Commonwealth* ("*Mass. Lyons*"),[200] a Massachusetts decision, Defendants contend that Section 4A does not prevent the General Assembly from expanding the

---

[199] 279 A.3d ----, 2022 WL 3039295 (Pa. Aug. 2, 2022).

[200] 192 N.E.3d 1078 (Mass. 2022).

list of persons eligible for mail-in voting. *McLinko* and *Mass. Lyons* interpreted their own state constitutions against the background of different decisional law and legislative amendments. Compared with Delaware decisions that interpret the Delaware Constitution in the context of Delaware legal history, *McLinko* and *Mass. Lyons* start at a disadvantage.[201]

In *McLinko*, the Supreme Court of Pennsylvania upheld the validity of a universal mail-in voting statute. To do so, the *McLinko* court overruled 160 years' worth of Pennsylvania precedent holding that the Pennsylvania Constitution required in-person voting unless the voter fell into one of the textually enumerated categories of persons eligible for absentee voting.[202] The *McLinko* court emphasized that "any restrictions" on the legislature's power to enact voting legislation "must be explicit."[203] After *McLinko*, the Pennsylvania legislature may prescribe any method of voting so long as the method promotes secrecy.[204]

---

[201] *See Jones v. State*, 745 A.2d 856, 864 (Del. 1999) ("A state constitution's language may itself provide a basis for reaching a result different from that which could be obtained under [a different source of] law." (internal quotation marks omitted)).

[202] 2022 WL 3039295, at *19–29.

[203] *Id.* at *31.

[204] *Id.* at *30–34.

In *Mass. Lyons*, the Supreme Judicial Court of Massachusetts also upheld a universal absentee voting statute. In doing so, the *Mass. Lyons* court described the Massachusetts Constitution as a "statement of general principles and not a specification of details."[205] Consistent with its unrestricted structure, the *Mass. Lyons* court observed that the Massachusetts Constitution grants the legislature "plenary . . . authority . . . to regulate the process of elections."[206] Based on that plenary authority, the *Mass. Lyons* court held that the Massachusetts legislature may prescribe any method of voting so long as the method chosen "protect[s] and enhance[s] . . . the right to vote" and is not "repugnant" to another provision in Massachusetts Constitution.[207]

Notably, the *Mass. Lyons* plaintiffs also invoked the maxim of *expressio unius est exclusio alterius* to argue that, by specifying only three categories of persons eligible for absentee voting, the Massachusetts Constitution prohibited universal mail-in voting by negative implication. The *Mass. Lyons* court rejected this argument.[208] The *Mass. Lyons* court explained that *expressio unis* is ill-suited to

---

[205] 192 N.E.3d at 1086 (internal quotation marks omitted).

[206] *Id.* at 1087 (internal quotation marks omitted).

[207] *Id.* at 1091–92.

[208] 192 N.E.3d at 1092.

constitutional interpretation and so cautioned that it should not be used to restrain a legislature from enacting laws that advance fundamental rights:

> [*Expressio unis*] is a maxim that has oft been considered in connection with interpreting statutes . . . . It is a guide to construction, not a positive command, and at most only a fallible aid to decision . . . . Cases from other jurisdictions have consistently counselled that the maxim should be applied with even greater caution when interpreting a State constitution . . . . Silence is subject to multiple interpretations; it is not sufficient to rebut the presumption of constitutionality or to prove repugnancy.[209]

*McLinko* and *Mass. Lyons* share similarities to this case. Both cases examined universal mail-in voting laws. Both cases analyzed constitutional provisions purporting to limit absentee voting to finite categories of eligibility. And both cases stand for a general proposition that state constitutions should not be interpreted to impliedly restrict the legislature's power to universalize mail-in voting.

*McLinko* and *Mass. Lyons*, however, are incompatible with currently binding Delaware precedent. They may well serve as useful authority in the inevitable appeal of this decision, but my analysis is constrained by Delaware precedent.

As already explained, based on the weight of precedential authority, I must conclude that the Vote-by-Mail Statute violates the Delaware Constitution. However, although I am compelled by Delaware precedent to find that Plaintiffs have demonstrated actual success on the merits as to the Vote-by-Mail Statute, I

---

[209] *Id.* at 1093 (cleaned up).

believe the Delaware Supreme Court may conclude that it has grounds to revisit that precedent.

First, *Opinion of the Justices* was an "advisory opinion" not subject to the adversarial process.[210] Second, *Opinion of the Justices* expressly acknowledges that the "caveat as to general elections" at issue here is unnecessary to the analysis.[211] As such, one might conclude that the passage is dictum in an advisory opinion. Third, I believe that reasonable minds might now—eight decades later—have reason to question the source of this dictum, namely *State v. Lyons* and *State ex rel. Harrington v. Walker*.

Both *Lyons* and *Harrington* locate no express prohibition on absentee voting in the Delaware Constitution. Instead, both decisions identify an *implied* prohibition.[212] Yet, the identification of an implied constitutional restriction on legislative authority, where no express limitation exists, is a conclusion that I would draw with significant hesitancy. As has already been discussed, powerful doctrines of constitutional analysis are implicated here. These include the doctrine of constitutional avoidance and the understanding that, unlike the federal government,

---

[210] Randy J. Holland, *The Delaware State Constitution* 181 (2d ed. 2017).

[211] 295 A.2d at 722-23.

[212] *Op. of the Justices*, 295 A.2d at 721 ("In each of those cases, the Court found in the Constitution an implied limitation upon absentee voting in general elections.").

the General Assembly is imbued with all legislative power absent a limitation on that power that can be demonstrated clearly and convincingly.

The 1939 decision in *Lyons* invalidates a *vote-by-mail statute* adopted by the General Assembly in 1923. It appears that, just twenty-six years after the 1897 constitutional convention, the General Assembly adopted a relatively "broad[] in scope" statute that "provided for the casting of ballots by mail by persons unable to be personally present at the polling places in their districts on election day."[213] This state of affairs continued for the next decade-and-a-half, without apparent constitutional concern, until an indictment was brought against seven individuals for "conspiracy to abet fraud in connection with the casting of [absentee] votes . . . ."[214] It is unclear from the decision who six of the individuals were, but it appears that one of the individuals (named in the case caption) has been described as "one of the last of the old time political bosses" and was, at the time, the Wilmington chairman of a political party.[215] *Lyons* quashed the criminal indictment because the decision located, seemingly for the first time, an implied requirement in the Delaware

---

[213] *Harrington*, 30 A.2d at 690 (describing the statute challenged in *Lyons*).

[214] *Lyons*, 5 A.2d at 496.

[215] *Obituary of G.E. Lyons*, N.Y. Times (Feb. 7, 1960), https://timesmachine.nytimes.com/timesmachine/1960/02/07/119095555.pdf?pdf_redirect=true&ip=0; *see also* Carol E. Hoffecker, *Corporate Capital: Wilmington in the Twentieth Century* 148 (1983).

Constitution that voters appear in person at the polls and thus an implied prohibition on absentee voting. This made the underlying absentee vote-by-mail statute void and required that the indictment be quashed, because the defendants could not be prosecuted for conspiracy to violate a constitutionally void statute.

Over 80 years later, I obviously cannot draw any conclusions, particularly in this expedited context. But I believe we should at least be aware of the historical context of the *Lyons* decision, which invalidated a significantly older vote-by-mail statute that had been in place for years and which was the first decision to locate the implied restriction that now ties the hands of the General Assembly.

Just four years after *Lyons*, the decision in *Harrington* invalidated a statute that had long permitted soldiers to vote at their encampments.[216] Both *Lyons* and *Harrington* looked to various provisions of Article V to imply a prohibition on absentee voting. Quite significantly, however, the General Assembly adopted the statute at issue in *Harrington*—the Soldiers' Vote Act—in 1898, just a year after the 1897 constitutional convention. One would think that the General Assembly of 1898 knew well the intent of the 1897 framers and that the adoption of the 1898 law would

---

[216] *Harrington*, 30 A.2d at 692–93.

constitute significant evidence that the Delaware Constitution contained no implied prohibition on voting away from one's polling place.[217]

The *Lyons* decision also relied on a brief passage during a speech at the constitutional convention by Judge Spruance (as briefly discussed above) to support the notion that the absentee voting was prohibited. The passage follows:

> I say this [Article 5, Sec. 2] is based mainly upon the corresponding provision in the New York Constitution[, but, concerning a portion of the provision in the New York Constitution providing for absentee voting for soldiers,] [t]hat applied more particularly, perhaps, to such times as in the late War of the Rebellion when large numbers of citizens were in the service of the country and their votes, under special act of Assembly, were taken in the field. It was thought that such an unfortunate condition of affairs as that would not be likely to occur again. At all events, it was so removed that we thought it was not necessary to put it in.[218]

I believe reasonable minds could easily disagree about how the passage should be read—*i.e.*, as suggesting an affirmative prohibition on absentee voting (as *Lyons* concludes) or as indicating no firm position, one way or another, on the matter. The

---

[217] *See Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) (recognizing "the Court's emphasis that the First Congress 'was a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instruction'") (quoting *Myers v. United States*, 272 U.S. 52, 174-75 (1926)). One might also conclude that the decision in 1943—during World War II—to invalidate the Soldiers' Vote Act was eased significantly by the anticipated second leg of the amendment enacting Article V, Section 4A, which would be passed just two months after the *Harrington* decision and arguably make the outcome somewhat academic at the time. 44 Del. Laws ch. 118 (1943).

[218] *Lyons*, 5 A.2d at 501–02.

brief passage from the convention debates that *Lyons* quotes is, then, arguably made to bear more weight than it deserves.

Finally, the plain text of Article V, Section 4A does not clearly and convincingly reflect a prohibition on expanding the categories of permitted absentee voting. The text of Section 4A instead reads as an *affirmative* grant of power to the General Assembly, not a *limitation*. It says "[t]he General Assembly *shall enact general laws*" providing for absentee voting in certain circumstances. Under that reading, nothing would prohibit the General Assembly from enacting laws providing for absentee voting in additional circumstances. Coupled with the strong presumptions in favor of constitutionality and strong policy reasons for allowing the General Assembly to promote unfettered voting, that construction would likely control.

As I have already noted, I see my duty in this instance as determining whether there is a reasonable interpretation of the Constitution that would uphold the validity of the Vote-by-Mail Statute, rather than seeking out an interpretation that would result in the statute's invalidation. If I am able to interpret the constitution without straining or stretching and, in doing so, find a statute constitutionally valid, I believe I would be compelled to adopt that interpretation.

Here, the most straightforward interpretation of the constitutional text is that it speaks in terms of in-person voting at the polling place and is simply silent as to

absentee voting. Certainly, the framers of the Constitution of 1897 were aware of the potential for absentee voting. Indeed, the brief passage from the convention cited in *Lyons* makes this clear. But a reasonable interpretation of the short statement by Mr. Spruance at the convention is that the framers chose not to impose prohibitions or directives as to absentee voting and thereby left the issue up to future members of the General Assembly. The fact that Judge Spruance reported the omission of a provision specifically addressing absentee voting from the constitution does not automatically mean that the framers *prohibited* absentee voting. To the extent the framers wanted to, they could have easily included express language saying so. Yet they did not. In addition, the adoption of the Soldiers' Vote Act in 1898 and the broad mail-in voting act of 1923—all close in time to the constitutional convention—further suggest that the framers did not understand there to be an implied prohibition on absentee voting in the Constitution.

Certainly, the framers were deeply concerned with the issue of fraud in elections given their experience with elections in the nineteen-century, and they debated and put in place a detailed process governing in-person voting. Obviously, the framers believed they needed to develop a detailed system governing the basic and traditional form of voting, *i.e.*, in-person voting. To say that it then follows that the framers decided to prohibit, by implication, any other form of voting—and, in particular, absentee voting—is a leap seemingly inconsistent with principles of

71

constitutional interpretation.  One *might*, therefore, be concerned that the *Lyons* and *Harrington* decisions cobble together various passages and, in doing so, stretch and strain to imply a constitutional restriction where none appears in the plain text of the document or based on ordinary principles of constitutional interpretation.

I state the foregoing with a clear recognition that the doctrine of stare decisis is a cornerstone of our law.  Among its many features, the doctrine promotes stability, predictability, and overall coherence in our law.  Any departure from stare decisis is not to be considered lightly.

When I am confronted, however, with an *implied* limitation in our fundamental law (the Constitution) to citizens' fundamental right (voting), I believe I have a duty to consider—however, briefly—the source of the implied limitation. In this instance, no party has pointed me to any detailed appellate review of the implied absentee-voting restriction by our modern-era Supreme Court.  The only modern-era authority that has been identified is the non-adversarial, advisory *Opinion of the Justices*, which, as explained above, notes the implied restriction briefly in self-described dicta.  The precedent relied on in *Opinion of the Justices* seems to be the decisions of *Lyons* and *Harrington*, two decisions from the "leftover

judge" era of appellate review.[219]  Given the fundamental nature of the voting rights at issue, the *Lyons* and *Harrington* decisions may be worth revisiting.  But that is a decision for the Supreme Court.

Thus, if I were writing on a blank slate, I would likely conclude that the Vote-by-Mail Statute is not prohibited by the Delaware Constitution.  In that scenario, to invalidate the Vote-by-Mail Statute, I would need to find clear and convincing evidence of an express or implied prohibition in the Constitution and that is a very high bar to clear.[220]  I am not writing on a blank slate, however.  And as a trial judge, I am not in a position to revisit *Opinion of the Justices* or the decisions on which it relies—*Lyons* and *Harrington*.[221]

---

[219] Henry R. Horsey & William Duffy, *The Supreme Court Until 1951: The "Leftover Judge" System*, Delaware Supreme Court, https://courts.delaware.gov/supreme/history/history2.aspx (last visited Sept. 14, 2022).

[220] The fact that the General Assembly adopted Article V, Section 4A in 1943; adopted amendments to expand absentee voter categories since then; employed emergency powers to adopt the 2020 statute; and attempted a constitutional amendment in 2022 would not change this result.  These are all natural responses to the existence of case law finding an implied prohibition against absentee voting.  If a sign says "Electric Fence," one generally assumes the veracity of the statement without need for independent confirmation.

[221] Should the Delaware Supreme Court determine to revisit *Lyons*, *Harrington*, and *Opinion of the Justices*, then Defendants have identified a straightforward and compelling harmonization of the Vote-by-Mail Statute and Article V, Section 4A.  Namely, Defendants, citing *McLinko*, argue that Article V, Section 4A provides a constitutional floor for categories of absentee voting that cannot, by a simple majority of the legislature, be revoked.  2022 WL 3039295, at *33 ("While it is accurate that Act 77's provision of universal mail-in voting provides a way for designated absentee voters to cast their vote without resorting to the absentee voting provisions of the Election Code, this current ability to do so does not render Section 14 of Article VII surplusage.  As discussed, nothing in

## D. Plaintiffs Have Satisfied the Remaining Elements for a Permanent Injunction

As noted, to obtain a permanent injunction, a plaintiff must establish: (1) actual success on the merits; (2) irreparable harm will be suffered if injunctive relief is not granted; and (3) the harm that will result from a failure to enjoin the actions that threaten plaintiff outweighs the harm that will befall the defendant if an injunction is granted. Because I have concluded that precedent constrains me to interpret the Vote-by-Mail Statute as unconstitutional, Plaintiffs have satisfied the first prong. Plaintiffs have also satisfied the second and third prongs for their requested injunctive relief.

### 1. Irreparable Injury

I am satisfied that Plaintiffs have shown that they will suffer irreparable injury if the Vote-by-Mail Statute is not permanently enjoined. The unconstitutional infringement upon the voting franchise of Delawareans presented here is a harm that cannot be remediated by any remedy at law. Furthermore, if I were to not enjoin the Vote-by-Mail Statute, then the courts would be faced with the impossible task of

---

Article VII prohibits the legislature from eliminating the ability of qualified voters to cast their votes by mail, just as nothing in the Constitution required it to do so. By recently enacting Act 77, the legislature made a policy decision, based on the authority afforded it by our Charter, to afford all qualified voters the convenience of casting their votes by mail. However, acts of the legislature are not guaranteed to be permanent.") Under this reading, and without the implied constraints of *Lyons*, *Harrington*, and *Opinion of the Justices*, the Vote-by-Mail Statute does not render Section 4A surplusage.

"unscrambling the eggs" of an election undermined by unconstitutional votes.[222]

Given these considerations, Plaintiffs will suffer irreparable injury if the Vote-by-Mail Statute is not enjoined and doing so is necessary in the interests of justice.

While a somewhat elusive topic,[223] "[i]rreparable harm is generally defined as harm for which there can be no remedy at law, which is 'typically taken to mean that an award of compensatory damages will not suffice.'"[224] However, under Delaware law, the concept of irreparable harm is broader: "[i]t is not necessary that the injury be beyond the possibility of repair by money compensation but it must be of such a nature that no fair and reasonable redress may be had in a court of law and that to refuse the injunction would be a denial of justice."[225] This Court frequently finds

---

[222] Notably, the Pennsylvania Supreme Court highlighted in *McLinko* the impossibility of attempting to unwind an election. 2022 WL 3039295 at *3. There, the Pennsylvania Supreme Court remarked that a previous challenge to the Pennsylvania universal mail-in voting law was barred by laches because the petitioners had waited until after the applicable election and such a challenge could not be adjudicated while the ballots were in the process of being tallied. *See id*. at *3. Given that Plaintiffs have established the unconstitutionality of the Vote-by-Mail Statute, a failure to enjoin the statute could raise a similar situation, and it is imperative that this be avoided.

[223] As quipped in a learned treatise on the subject, irreparable injury, in contrast to the Supreme Court's notable definition of obscenity, "is often more easily defined than identified." Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* ("Wolfe & Pittenger") § 14.03(b)(4), at 22 (2019).

[224] *AM Gen. Hldgs. LLC v. Renco Grp., Inc.*, 2012 WL 6681994, at *4 (Del. Ch. Dec. 21, 2012) (quoting Wolfe & Pittenger §14.03(b)(4), at 22).

[225] *State v. Del. State Educ. Ass'n*, 326 A.2d 868, 875 (Del. Ch. 1974).

actions by boards of directors that threaten the voting franchise for stockholders as constituting irreparable harm.[226]  Similarly, this Court will find irreparable harm where failing to enjoin conduct that interferes with the stockholder voting franchise would result in an outcome that cannot be easily unwound.[227]  It is obvious that this Court should afford at least the same protection to the voting rights of Delaware citizens as it does to stockholders of Delaware corporations.

Plaintiffs will suffer irreparable harm if the Vote-by-Mail Statute is allowed to proceed because the law violates the constitutional protections afforded to their

---

[226] *See, e.g., Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 (Del. Ch. 1988) ("The shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests."); *Third Point LLC v. Ruprecht*, 2014 WL 1922029, at *23 (Del. Ch. May 2, 2014) (holding that improper use of a shareholder rights plan by the company's board of directors caused a threat of irreparable harm because it would be potentially dilutive of stockholders' voting power); *Telcom-SNI Invs., L.L.C. v. Sorrento Networks, Inc.*, 2001 WL 1117505, at *9 (Del. Ch. Sept. 7, 2001) (holding that actions by a board of directors that had dilutive voting effects "denied Plaintiffs their voting rights guaranteed to them by the Certificate"); *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *11 (Del. Ch. Aug. 27, 1987) (holding that the "loss of voting power constitutes irreparable injury" where a stockholders' statutory right to vote for directors is impeded); Wolfe & Pittenger § 14.03(b)(4), at 33 (stating that Delaware courts have a "tacit assumption that the unlawful interference with the corporate electoral process and the fundamental right of the stockholder to vote is inherently irremediable.").

[227] *See, e.g., Police & Fire Ret. Sys. of City of Detroit v. Bernal*, 2009 WL 1873144, at *2 (Del. Ch. June 26, 2009) (holding that the plaintiff had established likelihood of irreparable injury in part because it would be impossible to attempt to unwind a merger once it had been completed); *Fisk Ventures, LLC v. Segal*, 2009 WL 1478490, at *1 (Del. Ch. May 15, 2009) (holding that transactions that will result in a significant and perhaps unrecoverable loss represented "a clear example of irreparable harm"); *ODS Tech., L.P. v. Marshall*, 832 A.2d 1254, 1263 (Del. Ch. 2003) (noting that allowing an uninformed stockholder vote to proceed would force the court to "unscramble the eggs").

voting rights. As already discussed, the Vote-by-Mail Statute will result in the dilution of constitutional votes with unconstitutional votes. Furthermore, the fact that votes will be cast under this unconstitutional law means that the election will not be conducted in strict accordance with our Constitution. As Plaintiffs note, it would be "virtually impossible" to unwind the election, and "[f]rom a practical standpoint, the only remedy Plaintiffs have" is to prevent votes from being cast in violation of Article V, Section 4A as interpreted by our State's courts.[228] Consistent with this Court's established precedent in the stockholder voting context, irreparable harm is clear given the threats presented by vote dilution, an unfair election and that the outcome of such an election could not be unwound.

While I denied Plaintiffs' request for a temporary restraining order because Plaintiffs failed to show a threat of imminent irreparable harm, that had to do with the alleged harm in the interim between the TRO ruling and the issuance of this decision. The expedited schedule agreed to by the parties allowed for a decision well before the first mail-in ballots would be distributed, and therefore, the harm was not imminent. Any potential harm at that point was speculative because DOE had not mailed out any ballots. Moreover, the alleged harm of voter confusion about the

---

[228] Pls.' Combined Reply Br. at 35.

availability of mail-in voting was not irreparable, given the time before the general election to inform the public regarding the laws' challenge in the courts.

At this point, the nature of the harm is entirely different. When Plaintiffs requested a temporary restraining order, the issue was interim injunctive relief on a minimal record while the DOE was trying to implement a new law for primary elections, a law which is not challenged in this case. Today, the primary is over, and the next step is the imminent mailing of ballots and voting for the general election. Here, the irremediable nature of the harm is clear and entirely different. A failure to enjoin the Vote-by-Mail Statute would permit unconstitutional interference with the voting franchise and the results of such interference could not be easily unwound. This harm is imminent, non-speculative and would be irreparable.

### 2. Balance of the Equities

The balance of the equities favors Plaintiffs. Where, as here, a plaintiff demonstrates success on the merits and irreparable harm, the scope of my inquiry on the question of the balance of the equities is much narrower in focus than it is in the interlocutory context.[229] As the Supreme Court held in *Richard Paul, Inc.*,

---

[229] *See* Wolfe & Pittenger § 16.02(f), at 38.

permanent injunctive relief should only rarely be denied based on a balance of the equities where a plaintiff has established clear violations of his or her rights.[230]

Here, I have found that Plaintiffs have demonstrated success on the merits and that a failure to enjoin the Vote-by-Mail Statute will result in irreparable harm. Given this, Defendants must meet a high bar to show that public interest tips the scale in their favor. Defendants have not met this bar.

Although Delawareans have an indisputably strong interest in voting for their chosen slate, they also have an equally strong interest in the election being held in compliance with constitutional constraints. Defendants argue that a ruling striking down the Vote-by-Mail Statute is likely to result in voter confusion. But, as I observed in my ruling denying Plaintiffs' request for a temporary restraining order, the highly expedited schedule was to allow sufficient time to cure any confusion well before the general election. Defendants' argument is also belied by the fact that the DOE will not begin mailing ballots to electors who have requested to vote by mail until October 10, 2022. Since no ballots have been distributed, DOE will have more than sufficient time to make clear the categories of persons eligible to vote by absentee ballot. In contrast, if the Vote-by-Mail Statute is not permanently enjoined,

---

[230] *Richard Paul, Inc. v. Union Imp. Co.*, 91 A.2d 49, 54–55 (Del. 1952).

then the risk of voter confusion is significantly higher because mail-in ballots would be sent out to persons not eligible to vote by mail.

Through their balance of the equities arguments, Defendants invite me to consider whether the Vote-by-Mail Statute constitutes good public policy in weighing whether to issue injunctive relief. As a trial judge in this context, however, my role is very limited. I acknowledge that Delaware has a strong policy in favor of its citizens robustly exercising their right to vote. I further acknowledge that voters may be unable to exercise their right to vote for numerous reasons, including because they are working on election day or suffer resource constraints (*e.g.*, childcare or transportation constraints). My thoughts on the policy underlying the Vote-by-Mail Statute, however, are fairly irrelevant. Delaware precedent—at least as its stands today—requires me to issue an injunction.

Thus, the balance of equities weighs in favor of Plaintiffs, and their requested injunctive and declaratory relief as to the Vote-by-Mail Statute must be granted.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendants' motion for summary judgment is likewise GRANTED IN PART and DENIED IN PART.

The parties shall confer and submit a proposed implementing order within two business days.

*The Delaware Constitution*

## Article I.  Bill of Rights

### § 3. Free and equal elections.

Section 3. All elections shall be free and equal.

\* \* \* \*

## Article II.  Legislature

### § 1. General Assembly to hold legislative power; composition.

Section 1. The legislative power of this State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives.

\* \* \* \*

## Article V.  Elections

### § 1. Time and manner of holding general election.

Section 1. The general election shall be held biennially on the Tuesday next after the first Monday in the month of November, and shall be by ballot; but the General Assembly may by law prescribe the means, methods and instruments of voting so as best to secure secrecy and the independence of the voter, preserve the freedom and purity of elections and prevent fraud, corruption and intimidation thereat.

### § 4. Registration of voters; days for registration; application to strike name from list; appeals; registration as prerequisite for voting.

Section 4. The General Assembly shall enact uniform laws for the registration of voters in this State entitled to vote under this Article, which registration shall be conclusive evidence to the election officers of the right of every person so registered

1

to vote at any General Election while his or her name shall remain on the list of registered voters, and who is not at the time disqualified under the provisions of Section 3 of this Article; and no person shall vote at such General Election whose name does not at that time appear in said list of registered voters.

There shall be at least two registration days in a period commencing not more than one hundred and twenty days, nor less than sixty days before, and ending not more than twenty days, nor less than ten days before, each General Election, on which registration days persons whose names are not on the list of registered voters established by law for such election, may apply for registration, and on which registration days applications may be made to strike from the said registration list names of persons on said list who are not eligible to vote at such election; provided, however, that such registration may be corrected as hereinafter provided at any time prior to the day of holding the election.

From the decision of the registration officers granting or refusing registration, or striking or refusing to strike a name or names from the registration list, any person interested, or any registration officer, may appeal to the resident Associate Judge of the County, or in case of his or her disability or absence from the County, to any Judge entitled to sit in the Supreme Court, whose determination shall be final; and he or she shall have power to order any name improperly omitted from the said registry to be placed thereon, and any name improperly appearing on the said registry to be stricken therefrom, and any name appearing on the said registry, in any manner incorrect, to be corrected, and to make and enforce all necessary orders in the premises for the correction of the said registry. Registration shall be a prerequisite for voting only at general elections, at which Representatives to the General Assembly shall be chosen, unless the General Assembly shall otherwise provide by law.

The existing laws in reference to the registration of voters, so far as consistent with the provisions of this Article, shall continue in force until the General Assembly shall otherwise provide.

### § 4A. General laws for absentee voting.

Section 4A. The General Assembly shall enact general laws providing that any qualified elector of this State, duly registered, who shall be unable to appear to cast his or her ballot at any general election at the regular polling place of the election district in which he or she is registered, either because of being in the public service

of the United States or of this State, or his or her spouse or dependents when residing with or accompanying him or her because of the nature of his or her business or occupation, because of his or her sickness or physical disability, because of his or her absence from the district while on vacation, or because of the tenets or teachings of his or her religion, may cast a ballot at such general election to be counted in such election district.

* * * *

## Article XIV.  Oath of Office

### § 1. Form of oath for members of General Assembly and public officers.

Members of the General Assembly and all public officers executive and judicial, except such inferior officers as shall be by law exempted, shall, before they enter upon the duties of their respective offices, take and subscribe the following oath or affirmation:

"I, (<u>name</u>) , do proudly swear (or affirm) to carry out the responsibilities of the office of

(<u>name of office</u>) to the best of my ability, freely acknowledging that the powers of this office flow from the people I am privileged to represent. I further swear (or affirm) always to place the public interests above any special or personal interests, and to respect the right of future generations to share the rich historic and natural heritage of Delaware. In doing so I will always uphold and defend the Constitutions of my Country and my State, so help me God."

No other oath, declaration or test shall be required as a qualification for any office of public trust.

## Article XVII.  Continuity of Governmental Operations

### § 1. Continuity of state and local governmental operations in periods of emergency.

Section 1. The General Assembly, in order to insure continuity of State and local governmental operations in periods of emergency resulting from enemy attack, terrorism, disease, accident, or other natural or man-made disaster, shall have the

3

power and the immediate duty (1) to provide for prompt and temporary succession to the powers and duties of public offices whose immediate succession is not otherwise provided for by this Constitution, of whatever nature and whether filled by election or appointment, the incumbents of which may become unavailable for carrying on the powers and duties of such offices, and (2) to adopt such other measures as may be necessary and proper for insuring the continuity of governmental operations. In the exercise of the powers conferred by this section, the General Assembly shall in all respects conform to the requirements of this Constitution except to the extent that in the judgment of the General Assembly to do so would be impracticable or would cause undue delay.

**Article V. Elections**

Section 4. The General Assembly shall provide by law for a uniform biennial registration of the names of all the voters in this State who possess the qualifications prescribed in this Article, which registration shall be conclusive evidence to the election officers of the right of every person so registered to vote at the general election next thereafter, who is not disqualified under the provisions of Section 3 of this Article; but no person shall vote at such election unless his name appears in the list of registered voters.

Such registration shall be commenced not more than one hundred and twenty days nor less than sixty days before and be completed not more than twenty nor less than ten days before such election.  Application for registration may be made on at least five days during the said period; provided, however, that such registration may be corrected as hereinafter provided, at any time prior to the day of holding the election.

Voters shall be registered upon personal application only, and each voter shall, at the time of his registration, pay a registration fee of one dollar, for the use of the county where such registration fee is paid.

From the decision of the registration officers granting or refusing registration, or striking or refusing to strike a name or names from the registration list, any person interested, or any registration officer, may appeal to the resident Associate Judge of the county, or in case of his disability or absence from the county, to any judge entitled to sit in the Supreme Court, whose determination shall be final; and he shall have power to order any name improperly omitted from the said registry to be placed thereon, and any name improperly appearing on the said registry to be stricken therefrom, and any name appearing on the said registry, in any manner incorrect, to be corrected, and to make and enforce all necessary orders in the premises for the correction of the said registry.  Registration shall be required only for general biennial elections at which Representatives to the General Assembly shall be chosen, unless the General Assembly shall otherwise provide by law.

The existing laws in reference to the registration of voters, so far as consistent with the provisions of this Article, shall continue in force until the General Assembly shall otherwise provide.